40925, 40926. FUGITT v. THE STATE (two cases).
(319 SE2d 829)

HILL, Chief Justice.

In *Fugitt v. State*, 251 Ga. 451, 452 (307 SE2d 471) (1983), we reversed the conviction and death sentence of the defendant because, on extraordinary motion for new trial based on newly discovered evidence, it appeared that the state's case had been partially based upon perjured testimony. In so ruling, we did not reach several instances of alleged prosecutorial misconduct. Upon remand, the defendant raised these issues again in the form of a plea in bar before the trial court alleging that the state committed such egregious prosecutorial misconduct that retrial of the defendant is forever barred under the Double Jeopardy Clause of the fifth amendment, citing Oregon v. Kennedy, 456 U. S. 667 (102 SC 2083, 72 LE2d 416) (1982). After a hearing, the trial court denied the defendant's plea. He appeals that ruling. See *Patterson v. State*, 248 Ga. 875, 877 (287 SE2d 7) (1982). We affirm.

On this appeal, the defendant enumerates 13 instances of alleged prosecutorial overreaching and harassment. Four of these were referred to on the previous appeal. *Fugitt v. State*, supra at p. 453. Two of these four are identified by the defendant as being the most egregious: the monitoring of a conversation between defense counsel and an inmate at the jail by means of a "body bug," and the seizure from defense counsel's investigator of a brief case containing defendant's file.

Before we proceed, some background of the crime is necessary. The list of witnesses and participants is extensive. To begin, the de-

fendant (Fugitt) is also known as Wallace. The murder victim, who had a $15,000 life insurance policy which named the defendant as beneficiary, was last seen alive on the evening of August 14, 1981, arguing with the defendant. The victim, who died of strangulation, was found shortly after midnight. At about 12:30 a.m., the defendant went to the home of Don Ralph, told Ralph he had just strangled a man, said he was to receive $15,000 for the murder, and asked Ralph to provide an alibi for him. Ralph refused.

We now quote the incidents of alleged misconduct from our first opinion, supplemented with facts developed at the hearing on the defendant's plea in bar.

(A) "After being informed by an inmate [Earl Stocks] that Wallace [the defendant] had solicited him to kill a key witness for the state [Don Ralph], the district attorney's staff instructed the witness [Ralph] to make a false report to local police that an attempt had been made upon his life, and then referred to this false report in resisting before the court a defense motion." *Fugitt*, supra, 251 Ga. at 453.

The defendant contends that this episode was a hoax to scare Emory Connors, a witness favorable to the defendant,[1] and knowing it was a hoax, the assistant prosecutor referred to this false report of attempted murder of a state's key witness as an excuse to deny the defendant the addresses and phone numbers of witnesses.

The state's explanation is that after the potential hit man, inmate Earl Stocks, was solicited by the defendant to arrange to kill Don Ralph, Stocks' attorney informed the assistant prosecutor of the plot. The prosecutor decided to encourage Stocks to continue in this role in order to gather evidence against the defendant for soliciting the murder of a witness. He reasoned that news of an attempt on Ralph's life, relayed to the defendant through someone he trusted, such as Connors, would keep the defendant from hiring someone else to do the job and thus protect the witness. Unable to get Connors and the defendant together before the motions hearing, the prosecutor seized the opportunity to play out his scenario and stated to the court that witness Ralph had "reported" an attempt on his life. (The prosecutor now admits this decision lacked judgment.) In January 1984, the defendant was tried and convicted for solicitation to commit the murder of Don Ralph. The prosecutor's error in judgment logically would relate to this later case as well and if he testifies on retrial, Connors will be subject to examination as to whether the "hoax" influenced him.

---

[1] At the time, Connors was a witness for the state. There is some evidence in the trial transcript to support the inference that it was Connors who originally tipped the police that the defendant may have killed the victim.

(B) "Wallace [the defendant] complains that the district attorney's staff intervened in an investigation of an escape attempt at the jail where Wallace was held, which Wallace learned of and reported to the chief jailer. The district attorney's staff went to the jail and advised the inmates that Wallace had informed on them. Thereafter, two prisoners agreed to testify for the state that they had overheard Wallace admit to murder. One of the prisoners, Harris, testified that he overheard Wallace and Michael Denney (who was in New Mexico at the time of the killing) discussing how the two of them had killed Evans." *Fugitt*, supra, 251 Ga. at 453.[2]

The state presented evidence showing that defense counsel's investigator and the defendant informed the jailers of an impending escape attempt, and an investigation revealed six hacksaw blades and a 7-inch gash in the ventilation shaft. While investigating, the detective developed evidence on the murder charge against the defendant. He later told the other inmates the defendant turned them in because they were blaming another inmate. Although one inmate gave him information over a period of months, that inmate never altered or impeached his original statement. The information he got from the other inmates was received before he told them it was the defendant who had squealed, and he testified he never intended to influence them to testify against the defendant. (These inmates later testified against the defendant at his first trial and will be subject to cross-examination if they testify on retrial.) The defendant and his attorney's investigator were indicted, but acquitted, for attempting to aid this escape by smuggling in the hacksaw blades.

(C) "Another complaint involves the monitoring of a conversation between Wallace's counsel and an inmate at the jail. The district attorney's staff had the inmate send for counsel, purportedly to discuss representing him. The consultation between attorney and prospective client was recorded, surreptitiously, by means of a device known as a 'body bug.'" *Fugitt*, supra, 251 Ga. at 453.

The state here responded by testimony that after an assistant district attorney was called several times by an inmate, a meeting was set up with that inmate and his attorney. The inmate reported that the defendant's attorney offered him free legal representation if he would give perjured testimony at defendant's trial and solicited him to stab an inmate who was going to testify against the defendant. A body bug was then placed on the inmate, but his allegations were not substantiated by the monitor. The purpose of the bug was to obtain evidence of possible criminal acts by the defendant's attorney, not to

---

[2] The state argues it is not convinced of Denney's alibi because the documents he produced to prove his presence in New Mexico at the time of the victim's murder appear to have been altered.

obtain evidence on the murder charge against the defendant, and in fact no evidence about the murder was obtained. The defendant does not contend that any evidence obtained, directly or indirectly, by use of the body bug was used against him at his first trial.

(D) "On another occasion, when an investigator for Wallace's counsel visited Wallace in jail, she was detained, and her briefcase which contained defense counsel's file on Wallace's case, was seized and removed from her sight for about 45 minutes." *Fugitt*, supra, 251 Ga. at 453.

After inmates told a detective that the defendant was selling them drugs transported into the jail by defense counsel's investigator during unsupervised "contact visits," information was then obtained that she had also brought in the hacksaw blades. An arrest warrant was obtained. (As already noted, she and the defendant were thereafter indicted for attempting to aid an escape.)

After an apparently unsuccessful effort was made to serve the investigator with the arrest warrant the evening it was issued, she was served and searched pursuant to the arrest when she appeared at the jail the next day. At the time of the arrest the detective stood outside alone with the investigator's purse and briefcase for about 10-15 minutes while she was strip-searched by two matrons. He then received her consent to search the briefcase, but was warned that the defendant's file was in it. He nevertheless went around a corner to a desk out of her sight to search the briefcase; then, apparently upon verifying that the defendant's file was in it, arranged to have the district attorney retain the briefcase until the defendant's attorney could participate in the search so as to protect the confidentiality of his file. The defendant does not contend that the state learned anything concerning his defense or its case from his file.

(E) Defendant also now adds a fifth example of misconduct: that the prosecutor called as a witness Daryl Newton, the son of one of the defendant's former wives, to ask if the defendant had ever told him what he did for a living. When the defense objected on relevancy grounds, the assistant district attorney said in front of the jury, knowing it was inadmissible, that the answer would be that he made his living "killing people and being paid for it." The trial court, upon defendant's motion for mistrial, instructed the jury to ignore the prosecutor's statement and admonished the prosecutor, but declined to grant the mistrial. (We assume, in view of this admonition, that this incident will not be repeated on retrial.) The denial of the motion for mistrial was enumerated as error on the first appeal but we did not reach it due to the reversal on the perjury ground. We review it now, not as error in the overruling of the motion but in light of the double jeopardy plea before us.

The facts in Oregon v. Kennedy, supra, are similar to the last

incident referred to above. However, the procedural status in the Kennedy case was entirely different. There the prosecutor asked the state's expert witness whether he had ever done business with the defendant, who was charged with the theft of an oriental rug. When the witness answered that he had not, the prosecutor asked: "Is that because he is a crook?" The defendant's motion for mistrial was granted. When the state sought to retry the defendant, he pled double jeopardy and urged that the prosecutor's overreaching had necessitated that he move for mistrial. The Oregon Court of Appeals agreed, but the U. S. Supreme Court reversed, saying: "The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.' The Double Jeopardy Clause, however, does not offer a guaranty to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding. If the law were otherwise, 'the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again.'

"Where the trial is terminated over the objection of the defendant, the classical test for lifting the double jeopardy bar to a second trial is the 'manifest necessity' standard. . . ."[3]

"But in the case of a mistrial declared at the behest of the defendant, quite different principles come into play. Here the defendant himself has elected to terminate the proceedings against him, and the 'manifest necessity' standard has no place in the application of the Double Jeopardy Clause. . . .

"Our cases, however, have indicated that even where the defendant moves for a mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial." (456 U. S. at 671-673; citations and footnotes omitted.)

The Court went on to explain this narrow exception as prosecutorial misconduct intended to "goad" the defendant into moving for a mistrial, not merely prosecutorial misconduct warranting the grant of a mistrial, saying: "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the govern-

---

[3] (Footnote added.) Unique problems arise when the court grants a mistrial on motion made by the state or on the court's own motion. See *Abdi v. State*, 249 Ga. 827 (294 SE2d 506) (1982).

mental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." (465 U. S. at pp. 675-676.)

Because of defendant's reliance on Oregon v. Kennedy, supra, we have examined it at length.[4] However, we find it inapplicable here for the reason that the defendant's first trial did not end in a mistrial. Although the defendant moved for a mistrial as to one alleged instance of prosecutorial misconduct, that motion was not granted and the trial did not terminate. The Court in Oregon v. Kennedy addressed this situation also, saying: "If a mistrial were in fact warranted under the applicable law, of course, the defendant could in many instances successfully appeal a judgment of conviction on the same grounds that he urged a mistrial, and the Double Jeopardy Clause would present no bar to retrial." (456 U. S. at 676.)

We therefore find Oregon v. Kennedy inapplicable here because all but one of the incidents of alleged prosecutorial misconduct occurred either before or after trial, because the one trial incident did not result in a mistrial, and because the evidence does not show that any alleged incident of harassment was intended to subvert the protections afforded by the Double Jeopardy Clause. As indicated in Alcorta v. Texas, 355 U. S. 28 (78 SC 103, 2 LE2d 9) (1957), prosecutorial misconduct which deprives the defendant of due process of law causes the conviction to be set aside but does not preclude further proceedings against the defendant. We therefore find on the facts presented to us that the trial court did not err in overruling the defendant's plea of double jeopardy, and that plea is the only matter before us at this time.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 5, 1984 —
REHEARING DENIED SEPTEMBER 26, 1984.

*Philip L. Ruppert*, for appellant.
*Robert E. Keller, District Attorney, William L. McKinnon, Jr., Assistant District Attorney, Michael J. Bowers, Attorney General, Paula K. Smith, Staff Assistant Attorney General*, for appellee.

---

[4] Insofar as the defendant seeks to rely on cases prior to Oregon v. Kennedy, supra, 456 U. S. 667, we read them as being limited by the latter decision.