## 43315. FUGITT v. THE STATE.
(348 SE2d 451)

MARSHALL, Chief Justice.

Including one interlocutory appeal, this is the fourth appearance of this death penalty case. Twice before, we have reversed Fugitt's conviction and death sentence for the murder of John Evans.[1] For the third time, Fugitt has been convicted and sentenced to death. This time, finding no error in the conduct of the trial, and no unfairness in the imposition of the death penalty, we affirm.[2]

*Facts*

Fugitt, better known by his friends and acquaintances as Bill Wallace, had been friends with the victim, Johnny Evans, for years. They lived together until shortly before Evans' death, when their trailer was destroyed in a fire. Afterwards, Evans moved in with his brother Richard.

Evans spent the afternoon of August 14, 1981, visiting back and forth between Richard's apartment, his mother's house in East Point, and his brother Gene's residence in Stockbridge. The defendant stopped by Gene's place a few minutes after Evans had left, looking for him. He next went to Evans' mother's house, arriving again shortly after Evans had left. Fugitt told Mrs. Evans that Johnny was sick and ready to die, and predicted that something would happen to him that weekend, probably at the racetrack.

Fugitt finally located Evans at Richard's apartment. Richard had to leave for a brief period. Before he left, he saw Fugitt and Evans talking in the bedroom. Evans looked angry. When Richard returned, the other two had left.

At midnight that night, Evans' body was discovered, lying face down by the side of Lee's Mill Road in Clayton County. He was shirtless and, although he had just been paid that day, his pockets were empty. Death was later determined to have been caused by asphyxia from ligature strangulation.

At 11:30 p.m., Fugitt bought some beer in Riverdale, telling the cashier, whom he knew, to remember that he had been there at 11:30 p.m.

Shortly after midnight, Fugitt stopped by the home of a friend, Don Ralph. He told Ralph that his arms hurt and that he had just killed somebody. He showed Ralph a wad of money and stated that

---

[1] See *Fugitt v. State*, 254 Ga. 521 (330 SE2d 714) (1985); *Fugitt v. State*, 253 Ga. 311 (319 SE2d 829) (1984); *Fugitt v. State*, 251 Ga. 451 (307 SE2d 471) (1983).

[2] The death sentence was imposed January 16, 1986. A notice of appeal was filed February 5, 1986. The case was docketed in this court March 25, 1986, and orally argued May 21, 1986.

he had robbed the "boy" to make it look like that had been the reason he had been killed, and he told Ralph that he would get $15,000 for it. Then he asked Ralph to help him establish an alibi, to say that he had been at Ralph's house all evening. Ralph declined, since he had not been at home himself that evening. Next, Fugitt called a friend who worked at night and asked if he could visit the friend at work. The friend declined on the ground that such a visit was against company rules. The next day, Fugitt saw the friend and unsuccessfully sought her assistance in establishing an alibi for the evening of the 14th.

Fugitt also visited Mrs. Evans and the victim's brothers Richard and Grady the next day. He told Mrs. Evans that her son was not far away and that he was not going anywhere. He told Grady that he was supposed to have met Evans at the races, and suggested that Evans might have passed out in a ditch in the infield area and, since it had rained heavily, could have drowned. He told Richard that he had been with Evans early in the evening, but had let him out at a liquor store and had not seen him since. Fugitt and Richard spent most of the day looking for Evans. (Although the body had already been discovered, it was not identified until August 16.)

It was shown at trial that a life insurance policy had been issued to the victim on July 10, 1981, in the amount of $15,000. Fugitt was the beneficiary (ostensibly so that he would be able to care for the victim's minor daughter).

It was further shown that after Fugitt had been arrested for the murder of Johnny Evans, he had attempted to hire a fellow inmate to murder Don Ralph, whose testimony, the defendant feared, would get him convicted.

Fugitt's conviction for murder is amply supported by the evidence. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### Enumerations of Error

1. First, the defendant complains that the court erred by allowing the state to present evidence which reflected adversely upon the defendant's character, when the defendant had not injected the issue of his character into the case.

(a) The defendant argues vigorously that the state should not have been allowed to prove that he had solicited a fellow inmate to murder Don Ralph, because not only was the evidence in any event irrelevant, but this court ruled in a previous appeal that such evidence was inadmissible and the ruling is now the law of the case.

We cannot agree on either count. In the most recent appeal of this case, we ruled that a portion of a tape-recorded interview with a

witness, Kenneth Frady (whose admitted perjury led to the reversal of the first conviction in this case), wherein the law enforcement officer conducting the interview had referred to a previous conversation in which Frady had alleged that the defendant had hired Frady's brother to "kill a witness," was highly prejudicial and should have been excluded, absent a proper foundation for the introduction of such evidence. We pointed out that the state had presented only "the bald assertion of a third party" that the defendant had hired Frady's brother to commit murder, and that there was no showing that such an attempt, if made, bore any connection whatever to the case at hand. *Fugitt v. State*, 254 Ga. 521 (6) (330 SE2d 714) (1985), and cits.

The question before us now is the admissibility of testimony by Earl Wesley Stocks that the defendant had solicited him to murder Don Ralph. Stocks' testimony is no "bald assertion of a third party." On the contrary, he directly observed the events to which he testified. Moreover, this was not a crime bearing no relationship to the issues at hand; Don Ralph was a major witness in *this* case.

"The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character. There are numerous other purposes for which evidence of other criminal acts may be offered, and when so offered, the rule of exclusion is simply inapplicable." McCormick on Evidence (2nd ed. 1972), § 190, pp. 447-448 (footnote omitted).

The legitimate purpose justifying the admission of Stocks' testimony is that it was evidence of a criminal act by the defendant, constituting an admission by conduct, intended to obstruct justice or avoid punishment for the crime on trial. McCormick, supra at 451; *Ross v. State*, 255 Ga. 1 (2b) (334 SE2d 300) (1985).

The testimony complained of on this appeal comes from a different witness and describes a different event from that dealt with previously. Whatever the parameters of the law-of-the-case rule, nothing in our previous opinion precluded the use of Stocks' testimony in the latest retrial of this case. The trial court did not err by allowing Stocks to testify.

(b) Stocks also testified that the defendant had talked "[a]bout this guy cheating [at cards] and he didn't care about killing him." The defendant now argues that the trial court should not have permitted this testimony. However, although this testimony was of questionable relevance, the defendant did not object to it, and the trial court did not err by failing to exclude it on the court's own motion.

(c) Relying upon OCGA § 24-9-1, the defendant argues that Evans' mother should not have been allowed to testify about a conversation between the victim and the defendant concerning the life insur-

ance policy, since she was "in the broadest sense" a party in interest, standing to receive the proceeds of the policy in the event the defendant was convicted.

It is not necessary that we determine whether Mrs. Evans was a party in interest "in the broadest sense" or otherwise, inasmuch as OCGA § 24-9-1 states that interest shall not be a ground for the exclusion of evidence.

The defendant also argues that the conversation was inadmissible hearsay and not admissible under any exception to the hearsay rule, as, for example, a dying declaration.

Mrs. Evans testified that after a fire destroyed the trailer shared by the victim and the defendant, a brief discussion of the insurance policy occurred. Mrs. Evans thought that the defendant had a $20,000 insurance policy on the victim's life. The defendant said it was not $20,000. The victim then asked, "[W]ell if you don't have $20,000, how much is it?" The defendant answered "$15,000."

What the victim said simply does not fall under the hearsay rule, since it was not offered "as an assertion to show the truth of the matters asserted therein." McCormick, supra, § 246, p. 584.

The statements by the victim, and by his mother, were significant only insofar as they illuminated the defendant's responses, which were admissible to show his knowledge of the policy, of the amount of the policy, and of his status as a beneficiary on the policy. See id. at 586. (The factual existence of the policy and its terms was proven by a representative of the insurance company that issued the policy.)

(d) Finally, the defendant complains of testimony offered at the sentencing phase of the trial that he was running "a store," buying items from the canteen while it was open and then selling them at a higher price while it was closed, and selling liquor and marijuana brought to him during contact visits. According to the witness who testified to this activity, the defendant had stated that "his lawyer's secretary would bring [the liquor and marijuana] to him." The witness testified that after one contact visit the defendant smelled like perfume and had lipstick on his handkerchief.

The defendant points out that he and the lawyer's secretary/ paralegal had previously been prosecuted and acquitted on charges of attempted escape, and argues that principles of collateral estoppel would preclude relitigating in this case facts resolved in the defendant's favor in the escape trial. See *Moore v. State*, 254 Ga. 674 (333 SE2d 605) (1985).

We agree that collateral estoppel would require the exclusion of "testimony concerning an escape attempt allegedly planned by appellant with the help of his attorney's paralegal . . ." We said as much in the previous appeal of this case. *Fugitt v. State*, supra, 254 Ga. at 524. However, no such evidence was presented in the most recent trial

of this case, and the acquittal on the escape charge did not necessarily resolve in the defendant's favor whether the defendant received drugs and liquor during contact visits. *Moore v. State*, supra.

The defendant also contends that this evidence "cast aspersions" on his attorney.

"[It is not] accurate to state that defense counsel, in general, act in underhanded and unethical ways, and absent specific evidence in the record, no particular defense counsel can be maligned." *Bruno v. Rushen*, 721 F2d 1193, 1195 (9th Cir. 1983). "No prosecutor . . . may impugn the integrity of a particular lawyer or that of lawyers in general, without basis in fact, as a means of imputing guilt to a defendant." *United States v. McDonald*, 620 F2d 559, 564 (5th Cir. 1980).

In this case, the evidence did not relate directly to the defense attorney, but to his secretary; more importantly, the inferences of misconduct here have a basis in fact, and, by demonstrating the means by which the defendant received contraband, explain how the defendant could have been selling contraband while incarcerated. Of course, a defendant's character in general, and his conduct while in prison, are relevant to the question of sentence. See *Fair v. State*, 245 Ga. 868, 873 (268 SE2d 316) (1980); cf. *Skipper v. South Carolina*, ___ U. S. ___ (39 CrLR 3041) (Case no. 84-8859, decided April 29, 1986). The trial court did not err by allowing the testimony.

2. In his second enumeration, the defendant argues that the testimony of three "multi-convicted" felons, whose testimony was the product of lenient treatment by the state, should have been excluded. The record shows, however, that only one of the three witnesses had received the benefit of favorable treatment in exchange for his testimony, and this witness had fully received his benefit — a lenient sentence recommendation — long before he testified at this trial.

Fugitt was allowed to explore fully any questions regarding sentencing recommendations or other benefits for the state's witnesses. See *Owens v. State*, 251 Ga. 313 (1) (305 SE2d 102) (1983). Whether the state may "consistent with due process offer favorable treatment to a prosecution witness *contingent upon the success of the prosecution*," *United States v. Waterman*, 732 F2d 1527, 1531 (8th Cir. 1984) (emphasis supplied), is a matter which we will address if and when such a case is presented to us. We find no error here.

3. The defendant's daughter was asked on direct examination whether Don Ralph had ever slapped her. The state's objection to this question was overruled and she answered that he had. The defendant then asked, "Would you tell the jury why?" The state objected to this question and the objection was sustained. The defendant argues that "the trial court erred by reversing its previous ruling."

The court did not "reverse" its ruling. It simply dealt with two different objections to two different questions.

On its face, the second question calls for conjecture and speculation. The defendant made no offer of proof concerning how the witness would have testified if she had been allowed to answer the question, nor did he attempt to elicit specific facts relating to the incident that would have been within the personal knowledge of the witness and which might have provided the jury with a basis for inferring the reason for the slap. We find no error.

4. Fugitt argues that the trial court committed reversible error by refusing to allow him to cross-examine Don Ralph with an FBI "rap sheet" after it was shown that original records of convictions had been destroyed by a courthouse fire in Michigan in 1978.

"Rap sheets" are hearsay, and, as anyone who has ever utilized them knows, while they might suffice to alert one to the possibility that a person has a criminal record, and might suitably provide a starting point for an investigation into that prior record, they are often to some degree inaccurate.

However, it is not necessary for us to hold that such documents can never be admissible no matter what the necessity. See OCGA § 24-3-1 (b). Fugitt has not shown that relevant criminal-record evidence was destroyed in a courthouse fire.

The only reference to a courthouse fire in the evidence presented at trial is a typewritten response to the defendant's original inquiry to the district court in Ithaca, Michigan. This response, ostensibly from the clerk of the district court, stated that "Alma Municipal court records and Ithaca Justice of Peace records were destroyed by fire in County Courthouse in December, 1978." In response to a further inquiry from the defendant, the clerk wrote back that, of the three Michigan entries on the rap sheet, one was a misdemeanor offense of "non-sufficient funds" from 1959. Since that was 10 years before the district court was formed, they had no record of the offense. One of the two remaining entries was "fugitive (Par. Viol)," with no disposition indicated, and the final one — a 1959 "U & P" — was, according to the district court clerk, a felony which would have been prosecuted in the Gratiot County circuit court. However, after being contacted, the clerk of the circuit court informed the defendant that she had no record on Don Ralph.

Even if evidentiary effect is given to these letters, they do not establish that records pertaining to Don Ralph were destroyed in a fire.

The defendant was allowed to prove by competent evidence that Don Ralph had a number of bad-check convictions. The trial court committed no error by refusing to allow the defendant's attempt to present hearsay evidence in the form of a rap sheet.

5. The record does not support Fugitt's contention that the state withheld evidence of prior convictions of state's witnesses, and he has

failed to show any violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

6. In his 6th and 7th enumerations of error, Fugitt argues that Don Ralph's testimony should have been excluded altogether because he perjured himself in the first trial of the case. At least, he argues, the trial court should have charged OCGA § 24-9-85 (b), which provides, "If a witness shall willfully and knowingly swear falsely, his testimony shall be disregarded entirely, unless corroborated by circumstances or other unimpeached evidence."

The basis for these enumerations is testimony by Don Ralph about his prior record. We have reviewed his testimony at the first trial of this case, in particular, at pages 623-25 and 638-39 of the trial transcript in case number 39816. Ralph admitted having six bad-check convictions in Gordon County. He failed to volunteer that he also had bad-check convictions in other places, but he did not positively testify that he had no prior record except in Gordon County. In the instant trial, Ralph explained that he had not mentioned cases from elsewhere than Gordon County because he had not been asked.

OCGA § 24-9-85 (b) is applicable where "the witness admits . . . that he wilfully and knowingly swore falsely, or [where] the testimony [is] such as to render the purpose to falsify manifest." *Smith v. State*, 74 Ga. App. 777 (2) (41 SE2d 541) (1947). The circumstances of this case do not demand a finding that Ralph wilfully and knowingly testified falsely. Hence, his credibility was an issue to be evaluated by the jury. Compare *Fugitt v. State*, supra, 251 Ga. at 452-53. Absent a request, the trial court did not err by failing to charge the language of OCGA § 24-9-85 (b). Compare *Hill v. State*, 159 Ga. App. 489 (2) (283 SE2d 703) (1981).

7. In his final enumeration of error, Fugitt argues that the trial court should have granted his plea in bar on the grounds of prosecutorial misconduct. Virtually everything raised here has been addressed previously, in *Fugitt v. State*, supra, 253 Ga. 311, or elsewhere in this opinion. What little remains finds no support in the record. This enumeration of error has no merit.

## Sentence Review

8. The jury found that the murder had been committed "for the purpose of receiving money" and recommended a death sentence. See OCGA § 17-10-30 (b) (4); *Romine v. State*, 251 Ga. 208, 213 (305 SE2d 93) (1983). The evidence supports this finding. OCGA § 17-10-35 (c) (2).

9. We find that the sentence of death was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1).

10. Fugitt has a prior record of assault with intent to rob and solicitation to commit murder. In this case, he murdered his best friend to collect the proceeds of a $15,000 life insurance policy. The death sentence is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 23, 1986.

*Philip Louis Ruppert,* for appellant.

*Robert E. Keller, District Attorney, Michael J. Bowers, Attorney General, Paula K. Smith, Assistant District Attorney,* for appellee.

APPENDIX.

*Baxter v. State,* 254 Ga. 538 (331 SE2d 561) (1985); *Castell v. State,* 250 Ga. 776 (301 SE2d 234) (1983); *Tucker v. State,* 245 Ga. 68 (263 SE2d 109) (1980); *Davis v. State,* 241 Ga. 376 (247 SE2d 45) (1978); *Douthit v. State,* 239 Ga. 81 (235 SE2d 493) (1977); *Stephens v. State,* 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State,* 236 Ga. 697 (224 SE2d 910) (1976); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976).