## 45351. WILLIAMS v. THE STATE.
(369 SE2d 232)

MARSHALL, Chief Justice.

This case comes to this Court as a direct appeal, see generally *Patterson v. State,* 248 Ga. 875 (287 SE2d 7) (1982), from the trial court's denial of the appellant Williams' plea in bar in which he contends that the state, by reason of operation of the Double Jeopardy Clause, is precluded from subjecting him to retrial on a charge of murder following occurrence of the following three events in this case: (1) reversal by this Court of the appellant's initial conviction in his direct appeal thereof in *Williams v. State,* 250 Ga. 463 (298 SE2d

492) (1983) (*Williams I*); (2) reversal in *Williams v. State*, 254 Ga. 508 (330 SE2d 353) (1985) *(Williams II)* of the conviction that was obtained against the appellant in the trial conducted after rendition of the decision in *Williams I*; and (3) the trial court's declaration of a mistrial due to the inability of the jury to reach a unanimous verdict in the retrial held after *Williams II*.

In this appeal, the appellant enumerates error, not only upon the denial of his plea of double jeopardy, but also upon the trial court's denial of another motion filed by the appellant in which he seeks the disqualification of the district attorney and his staff in this case. For reasons which follow, we affirm the trial court's denial of both motions.

## Statement of Facts

From a reading of this Court's opinions in *Williams I* and *Williams II*, and a review of the record in the present appeal, the facts of this case, including but not limited to the evidence admitted at the trial-level proceedings, can be stated as follows:

The victim, Danny Hansford, was a frequent house guest of the appellant, and the two of them were engaged in a homosexual relationship.

The victim had an explosive temper, and on April 3, 1981 (approximately one month prior to the victim's death), the appellant testified that the victim went into a drug-and-alcohol-induced rage and shot a hole into the floor.

The appellant reported the April 3rd incident to the police on the night of its occurrence. Corporal M. J. Anderson of the Savannah Police Department was the investigating officer, and he testified at the initial trial that when he arrived at the scene, although he found a bullet hole in the floor underneath the carpet in the room in which the appellant stated the shooting occurred, he could not determine whether it " 'was a new type of gunshot or was an old one.' " 250 Ga. at 464. In closing argument, the prosecutor contended that the incident was thus contrived as a prelude to the eventual murder of the victim one month thence.

In the early morning hours of May 2, 1981, the Savannah Police Department received another telephone call from the appellant, in which he stated that he had been involved in a shooting and that the police should be sent.

Corporal Anderson, again the investigating police officer, arrived at the appellant's house within minutes after the call was received. He testified that he found the victim lying face down with his right hand above his head and a pistol under his hand; the victim had no discernible pulse and was not breathing. He had been shot once in the

chest, once in the back, and once in the head.

The appellant's trial testimony was that the victim had shot at him when he, the appellant, was seated behind his desk, and, in self-defense, the appellant then fired three quick shots into the deceased.

As stated in *Williams I*, the state's contention at trial was that the appellant

> shot the victim with one gun which he placed on his desk, then shot at his desk and chair with a second gun, and pulled the victim's right hand from under his body and placed the second gun under the victim's hand.

Id.

Circumstantial evidence consistent with this hypothesis included testimony by the police that the blood found on the victim's right wrist and hand, as well as the blood found on the gun used by him, had been smeared thereon. And, there was no blood found on the floor in the vicinity of the victim's right hand, although blood was found on the floor underneath the victim. In addition, bullet holes in the floor corresponded to gunshot wounds to the victim's back and head when the victim's head was placed in a position facing to the right; as the corpse was found by the police, the victim's head was facing to the left. Further, the leg of a chair sitting upright was on the victim's pant leg, the pistol used by the appellant was found on the appellant's desk, and paper fragments were found on top of this pistol. Finally, tests of the victim's right hand showed no gunpowder residue.

Prior to the initial trial, defense counsel received a copy of portions of the April 3rd incident report pursuant to an OCGA § 17-7-210 request by the defense for statements made by the appellant while in police custody. These documents were furnished to the defense after the trial court had conducted an in-camera inspection of the incident report. Prior to the giving of the jury charge, defense counsel specifically inquired of the prosecutor as to whether any portion of the April 3rd incident report would "take away from" or "not support" Corporal Anderson's trial testimony concerning the freshness of the bullet hole. Id. The prosecutor responded in the negative.

The foregoing statement of the prosecutor was, however, factually inaccurate. As noted in *Williams I*, although Corporal Anderson's testimony was that he could not determine whether the bullet hole found on April 3rd was " 'a fresh or an old one,' " it was ascertained subsequently that contained within Corporal Anderson's April 3rd incident report was a written statement by him that the gunshot hole found in the floor was "fresh." Id.

It was held in *Williams I* that a new trial was, therefore, required under *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215)

(1963), even though the undisclosed evidence may not have created "a reasonable doubt of guilt which did not otherwise exist." 250 Ga. at 465. More specifically, it was held that, even though the April 3rd incident was not directly in issue in appellant's trial, the defense had made a specific, albeit belated, oral request for information concerning any discrepancy between the police officer's testimony and the contents of his incident report, and there in fact existed a "patent discrepancy" between the two. Id. at 466. In addition, as previously noted, the prosecution utilized the police officer's testimony on this point in support of the state's case-in-chief.

However, as stated in *Williams I*, the investigating officer's testimony "may or may not have been" intentionally false. Id. And, it is clear that no intentional "corruption of the truth-seeking function of the trial process" by the prosecutor has been established here. Id. In this regard, the prosecutor has subsequently testified that the statement made by him during the appellant's first trial, regarding the lack of inconsistency between the earlier incident report and the investigating officer's trial testimony, was attributable to a lapse of memory on his part and was not an intentional misstatement. This testimony finds corroboration in the fact that the trial judge, who conducted an in-camera inspection of the incident report, apparently also failed to recall the inconsistency.

The murder conviction obtained against the appellant at his second trial was reversed in *Williams II* on the ground that the trial court erred in allowing a Savannah detective, appearing as an expert witness on behalf of the state, to testify as to certain conclusions reached by him as a result of certain proved facts in the case. Specifically, based on facts in evidence, this witness testified, by way of expert conclusion on his part: (1) that the victim's head had been moved after he fired his pistol; (2) that the victim would have been unable to move the chair over his pants leg after he had been shot; and (3) that, by virtue of the location of the paper fragment, the appellant must have placed his pistol on the desk before the victim's pistol was fired over the desk.

It was held in *Williams II* that the trial court's admission of this testimony, concerning these conclusions of the expert witness, was in violation of the rule, found in Georgia's law of evidence, that an expert witness is allowed to testify only as to those conclusions which are " 'beyond the ken of the average layman.' *Fordham [v. State* 254 Ga. 59, 60 (325 SE2d 755) (1985)]." 254 Ga. at 510. The majority of this Court held in Division 2 of *Williams II* that these conclusions did not fit within that category, and a new trial was therefore required, notwithstanding the holding in Division 1 that the evidence authorized a rational trier of fact in finding the appellant guilty beyond a reasonable doubt.

It was held in Division 3 of *Williams II* that a demonstration by the prosecutor of the pull of the victim's handgun should have taken place during the evidentiary phase of the trial, rather than in closing argument to the jury. However, the question of whether this error would have constituted reversible error in and of itself was expressly reserved.

In *Williams II*, it was noted, as in *Williams I*, that the state produced evidence of the negative results of the gunpowder-residue test performed on the victim's hands. However, it was also noted in *Williams II* that

> [a]n expert witness for appellant testified that the type of pistol that the victim allegedly used in the attack produced residue on the hand of the person firing the gun only fifty percent of the time.

Id. at 509.

At the third trial, as we have previously stated, a mistrial was declared by the trial court due to the inability of the jury to reach a unanimous verdict; the jury vote was, in fact, 11-to-1 for conviction.

During the course of the third trial, a subpoena issued by the defense for all hospital records resulted in the production of an emergency-room admitting sheet from the hospital to which the deceased was taken. A notation on this sheet seemed to indicate that the victim's hands were not bagged by the police at the scene of the crime, as previously testified to by the police; but rather, this notation, with some ambiguity, indicated that the victim's hands were bagged by medical personnel in the emergency room of the hospital to which the victim was taken.[1]

Although the appellant made a request under OCGA § 17-7-211 (a) for a copy of the county coroner's autopsy report, this emergency-room form was not in the prosecutor's file, and was thus not submitted to the appellant as part of the autopsy report. Although the appellant vigorously contends that the emergency-room form is a component part of an autopsy report within the legal definition thereof, the statutory and case law on this subject fail to support this assertion.[2] In addition, present defense counsel, during approximately four

---

[1] This ambiguity arose from the fact that the emergency-room nurse who apparently bagged the victim's hands placed the notation of "hands bagged" under the heading of "nurse assessment" rather than under "orders and treatment." The former category pertains to things observed by the nurse; the latter category was the appropriate place for the nurse to have noted the fact that she bagged the victim's hands in the emergency room.

[2] An autopsy report is specifically stated to be a scientific report under OCGA § 17-7-211 (a). "Autopsy" is defined in OCGA § 45-16-21 (1) as "the dissection of a dead body and the removal and examination of bone, tissue, organs, and foreign objects for the purpose of deter-

years of representing the appellant, did not complain of the omission of this form from the autopsy report produced by the state. And, prior defense counsel testified that such forms are not generally considered part of an autopsy report, as did experts in the fields of forensic science and medicine.

At the third trial, the appellant contended that in view of the fact that the victim's hands were not bagged until the corpse was taken to the hospital emergency room, the negative results of the gunpowder-residue test were meaningless, in view of the likelihood of removal of any gunpowder residue by police officers, funeral-home personnel, and hospital employees. In response, the prosecutor, in reliance on the previously noted ambiguity in this hospital record, see n. 1, supra, argued that the appellant's contention in this regard should be rejected.

Immediately after termination of the third trial, the prosecutor was apparently besieged by representatives of the media, and, in response to questioning, he made statements which were subsequently broadcast on television and printed in the newspapers. Referring to the history of this case, the prosecutor stated, "So far as I see it, the score is 35-to-1 for conviction, and I'm confident that if we bring it back and get a jury that is willing and able to decide, then we'll get the right result." He further stated, "Two juries have voted unanimously for conviction. Another has voted 11-to-1 for conviction. In my opinion, therefore, there is substantial reason to believe Mr. Williams is guilty of the offense charged."

After the conclusion of the third trial, the prosecution subsequently located another hospital employee whose initials also appeared on the emergency-room form, and the statement given by this hospital employee corroborated the proffered fact that the victim's hands had been bagged in the emergency room. The prosecution, in turn, informed the defense of the discovery of this corroborating witness. *Held:*

1. The issue formulated by the appellant, in the argument and citation of authority advanced by him in support of his first enumeration of error, is whether prosecutorial misconduct has occurred in this case and, if so, is of such character as to give rise to the bar of double jeopardy, thereby erecting a constitutional prohibition against the state's subjecting the appellant to further retrial on the present murder charge.

---

mining the cause of death and circumstances surrounding the same." "In *State v. Madigan,* 249 Ga. 571, 574, fn. 2 (292 SE2d 406) (1982), . . . [w]e noted that the element common to the examples of scientific reports listed in OCGA § 17-7-211 . . . was 'that each includes the examiner's findings based on scientific analysis or his or her opinion.' " *Williams v. State,* 251 Ga. 749, 754 (3) (312 SE2d 40) (1983).

In addressing this argument, it should be recognized at the outset that, under both state and federal criminal law, it is a quantum leap from a conclusion that the reversal of a criminal conviction is necessary, to a holding that, as a result of the error or errors upon which the reversal is predicated, the Double Jeopardy Clause erects a constitutional barrier to further prosecution of the defendant. In this regard, it is a well-established tenet underlying the Double Jeopardy Clause that to bar retrial of a criminal defendant, on the sole ground that trial error necessitates reversal of the conviction, is far too high a price for society to pay for the vindication of the rights of criminal defendants under our scheme of government, and was never intended by the Double Jeopardy Clause. See *Oregon v. Kennedy*, 456 U. S. 667 (102 SC 2083, 72 LE2d 416) (1982) and cits.

It has been recognized in many cases that the primary purpose underlying the Double Jeopardy Clause is to prohibit the retrial of a criminal defendant where the prosecution has, at the initial trial, produced insufficient evidence to sustain a conviction. E.g., *Burks v. United States*, 437 U. S. 1 (98 SC 2141, 57 LE2d 1) (1978); *Hall v. State*, 244 Ga. 86 (5) (259 SE2d 41) (1979). The general rule is that retrial of the defendant is not barred where reversal of the conviction results from trial error rather than evidentiary insufficiency. *Burks v. United States*, supra; *Hall v. State*, supra; OCGA § 16-1-8 (d) (2). And, although it is generally the rule that by making a motion for mistrial the defendant thereby waives any claim of double jeopardy, it is not surprising that another class of cases, in which the Double Jeopardy Clause stands as a bar to retrial of the defendant, is where the prosecutor has goaded the defense into making a motion for a mistrial in order for the prosecution to avoid reversal of the conviction because of prosecutorial or judicial error, or to otherwise obtain a more favorable chance for a guilty verdict on retrial. E.g., *Oregon v. Kennedy*, supra; *United States v. Martin*, 561 F2d 135 (8th Cir. 1977); *Fugitt v. State*, 253 Ga. 311 (319 SE2d 829) (1984). See also *State v. Whitehead*, 184 Ga. App. 162, 163 (361 SE2d 41) (1987). But see *United States v. Kessler*, 530 F2d 1246 (5) (5th Cir. 1976).[3]

Here, the appellant's convictions have been reversed in *Williams I* and *Williams II* for trial error and not evidentiary insufficiency. Aside from the alleged impropriety in extrajudicial statements made

---

[3] *Kessler* holds that retrial of the defendant is barred under the Double Jeopardy Clause where the prosecutor, through gross negligence, causes aggravated circumstances to develop which seriously prejudice the defendant, causing him to believe that continuation of the tainted proceeding would result in conviction. As authority for the proposition that retrial can be barred under the Double Jeopardy Clause as a result of gross prosecutorial negligence, *Kessler* cites *United States v. Beasley*, 479 F2d 1124, 1126 (5th Cir. 1973). *Beasley*, in turn, cites *Wade v. Hunter*, 336 U. S. 684 (69 SC 834, 93 LE2d 974) (1949), which, in our opinion, does not constitute authority for the proposition cited.

by the prosecutor, which we review in Division 2, infra, there are only two arguable instances of prosecutorial misconduct: (1) the *Brady* violation found to have existed in *Williams I*, and (2) the prosecution's failure to produce the emergency-room admitting sheet as part of the autopsy report, which, if the appellant is correct in his contentions, would also constitute a *Brady* violation, as well as a violation of OCGA § 17-7-211.

(A) As to the *Brady* violation found to have existed in *Williams I*, the trial judge was authorized in concluding that this did not constitute intentional prosecutorial misconduct.

In any event, it has been held that actions of the prosecutor constituting even intentional prosecutorial misconduct do not raise the bar of double jeopardy, notwithstanding the fact that the defendant was thereby deprived of due process of law, unless the prosecutor's actions were intended to subvert the protections afforded by the Double Jeopardy Clause. See *Fugitt v. State*, supra; *Oregon v. Kennedy*, supra. Perhaps the most heinous form of prosecutorial misconduct, which also constitutes one type of *Brady* violation, consists of the prosecutor's knowing use of perjured testimony to obtain a conviction, and, even in that situation, retrial has not been held to be barred by the Double Jeopardy Clause. See *United States v. Agurs*, 427 U. S. 97 (96 SC 2392, 49 LE2d 342) (1976); *Mooney v. Holohan*, 294 U. S. 103 (55 SC 340, 79 LE 791) (1935).

Thus, the *Brady* violation found to have existed in *Williams I* cannot be said to raise the bar of double jeopardy.

(B) As to the emergency-room form, the evidence shows that this document was not a part of the prosecutor's file. Under such circumstances, a prosecutor is generally not chargeable with a *Brady* violation for failure to produce such a document. See *Worth v. State*, 183 Ga. App. 68 (3b) (358 SE2d 251) (1987); *Baker v. State*, 245 Ga. 657 (3) (266 SE2d 477) (1980); *Hicks v. State*, 232 Ga. 393 (207 SE2d 30) (1974). See also *United States v. Eley*, 335 FSupp. 353, 358 (N.D. Ga. 1972).

In addition, as previously noted, it would appear that such hospital record is not a part of an autopsy report. See n. 2, supra.

In any event, for reasons previously given, it is clear that any error on the part of the prosecution in failing to produce this document cannot be classified as prosecutorial misconduct barring retrial of the appellant under the Double Jeopardy Clause.

(C) In addition, as previously noted, the defense raised no objection to the omission of this form until a subpoena issued by the defense during the course of the third trial produced the information. And, at the third trial the appellant utilized this newly-discovered information in his defense, and he did not request a mistrial or a continuance in order to obtain additional time for investigation. As

stated earlier in this opinion, the third trial terminated as a result of the jury's inability to reach a unanimous verdict, and it is well known that retrial under these circumstances is not barred by the Double Jeopardy Clause. E.g., *Glass v. State,* 250 Ga. 736 (2) (300 SE2d 812) (1983); *Cameron v. Caldwell,* 232 Ga. 611 (208 SE2d 441) (1974); OCGA § 16-1-8 (e) (2) (C).

2. In primary reliance upon the statements made by the prosecutor to the press following the third trial, the appellant argues that the impropriety chargeable to the prosecutor as a result thereof, when combined with other alleged incidences of prosecutorial misconduct in this case, establishes an inability on the part of the prosecutor and his staff to perform their prosecutorial duties, thereby requiring the grant of the appellant's disqualification motion.

(A) In this regard, DR 7-107 of Rules and Regulations of the State Bar of Georgia provides, in pertinent part, that generally a lawyer participating in or associated with the investigation of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication, unless the communication does nothing more than state without elaboration certain enumerated categories of information, including "information contained in a public record." DR 7-107 (A) (1); 252 Ga. at 629. An extrajudicial statement with respect to the prosecutor's or defense counsel's opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case is expressly prohibited. DR 7-107 (B) (6); 252 Ga. at 630. However, the provisions of DR 7-107 do not preclude a lawyer from replying to charges of misconduct publicly made against him. DR 7-107 (I); 252 Ga. at 630.

Not surprisingly, it has been held that where defense counsel makes an improper jury argument or tenders inadmissible evidence at trial, such error does not authorize the prosecuting attorney to commit any offsetting error in an attempt to rectify the error chargeable to the defense. *Jones v. State,* 14 Ga. App. 568 (81 SE 801) (1914); *Bennett v. State,* 86 Ga. 401 (12 SE 806) (1890); *Nixon v. State,* 14 Ga. App. 261 (80 SE 513) (1914). A contrary view would, of course, tend to eviscerate the rules of trial practice and procedure in criminal cases.

In a line of cases relied upon by the appellant, it has been held repeatedly, consistent with DR 7-107 (B) (6), that although it is permissible for a prosecuting attorney to argue to the jury that the facts proven lead to the conclusion that the defendant is guilty, *Parks v. State,* 254 Ga. 403 (330 SE2d 686) (1985); *Bland v. State,* 210 Ga. 100 (78 SE 51) (1953), it is, however, improper for a prosecuting attorney to express his personal opinion in the presence of the jury that the defendant is guilty, in that such opinion is not legal evidence and

cannot, therefore, be thrust into the case. *Hoerner v. State*, 246 Ga. 374 (4) (271 SE2d 458) (1980); *Iler v. State*, 139 Ga. App. 743 (3) (229 SE2d 543) (1976); *Nixon v. State*, supra; *United States v. Grunberger*, 431 F2d 1062 (2nd Cir. 1970).

> Where, however, the objection [to this] is sustained and the district attorney apologizes, there is normally no abuse of discretion in denying a motion for mistrial [predicated upon the prosecuting attorney's objectionable statement to the jury].

*Iler v. State*, supra, 139 Ga. App. at 744. But see *Powell v. State*, 179 Ga. 401 (176 SE 29) (1934).

The appellant's disqualification motion is similar to his double jeopardy plea, in that here, as there, it is a quantum leap from any conclusion that extrajudicial statements made by the prosecutor were improper, to the holding that disqualification of the prosecutor is required as a result thereof.

As argued by the prosecutor, the extrajudicial statements uttered by him did constitute an explanation as to the legitimacy of re-prosecution of the appellant based upon the three trials which had been conducted and the overwhelming votes of the jurors in favor of conviction therein. Implicit within our decision in *Williams I*, and as explicitly held in *Williams II*, the evidence introduced at both of these trials was sufficient to authorize a rational trier of fact in concluding beyond a reasonable doubt that appellant committed the murder. And, no argument has been made that the evidence admitted at the third trial was insufficient as a matter of law.

However, the prosecutor's comment concerning the "right result" can be said to have constituted an impermissible expression by the prosecutor of his opinion concerning the merits of the case.

(B) There are two generally recognized grounds for disqualification of a prosecuting attorney. The first such ground is based on a conflict of interest, and the second ground has been described as "forensic misconduct." In re J. S., 436 A2d 772, 774 (Vt. 1981) (Billings, J., dissenting), citing Note, *The Nature and Consequences of Forensic Misconduct in the Prosecution of a Criminal Case*, 54 Colum. L. Rev. 946 (1954).

A conflict of interest has been held to arise where the prosecutor previously has represented the defendant with respect to the offense charged, or has consulted with the defendant in a professional capacity with regard thereto; such conflict also has been held to arise where the prosecutor has acquired a personal interest or stake in the defendant's conviction. See *Vermont v. Hohman*, 420 A2d 852 (Vt.

1980).[4] See also *Fugitt v. State*, supra.

One of the primary examples of "forensic misconduct" consists of the improper expression by the prosecuting attorney of his personal belief in the defendant's guilt. See *Vermont v. Hohman*, supra. In determining whether an improper statement of the prosecutor as to the defendant's guilt requires his disqualification, the courts have taken into consideration whether such remarks were part of a calculated plan evincing a design to prejudice the defendant in the minds of the jurors, or whether such remarks were inadvertent, albeit improper, utterances. Cf. *Pierce v. United States*, 86 F2d 949 (6th. Cir. 1936), with *Dunlop v. United States*, 165 U. S. 486 (17 SC 375, 41 LE 799) (1897).

(C) Here, it is quite clear that any improper remarks made by the prosecutor were not of such egregious nature as to require his disqualification.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 26, 1988 —
RECONSIDERATION DENIED JUNE 14, 1988.

*Bouhan, Williams & Levy, Frank W. Seiler, Walter C. Hartridge, Donald F. Samuel,* for appellant.

*Spencer Lawton, Jr., District Attorney, David T. Lock, Assistant District Attorney, Michael J. Bowers, Attorney General,* for appellee.

---

[4] In *Hohman,* the prosecutor was disqualified for conflict of interest, because he had pledged in his reelection campaign to obtain a conviction against the defendant. Thus, there is no clear demarcation line between conflict of interest and forensic misconduct, and a given ground for disqualification of the prosecutor might be classifiable as either.