46719. ISAACS v. THE STATE.
(386 SE2d 316)

HUNT, Justice.

This is a death penalty case. The defendant, Carl J. Isaacs, was originally convicted in Seminole County and sentenced to death in 1974. His conviction and sentence were affirmed on direct appeal to this court. *Isaacs v. State,* 237 Ga. 105 (226 SE2d 922) (1976). However, the Eleventh Circuit Court of Appeals granted habeas relief. *Isaacs v. Kemp,* 778 F2d 1482 (11th Cir. 1985). Isaacs was retried in Houston County Superior Court and again was convicted and sentenced to death. We affirm.[1]

---

[1] The crime occurred on May 14, 1973. After the grant of habeas relief by the 11th Circuit, the case was returned to Seminole County. Pretrial proceedings resulted in the recusal of the trial judge assigned to preside over the retrial, see *Isaacs v. State,* 257 Ga. 126 (355 SE2d 644) (1987), and Superior Court Judge Hugh Lawson was assigned to the case.

1. In May of 1973, Carl Isaacs escaped from a Maryland penal institution and, accompanied by his younger brother Billy Isaacs, his half-brother Wayne Coleman and a friend, George Dungee, drove to Florida. On the afternoon of May 14, 1973, they were in Seminole County, Georgia, and their car was almost out of gas. They thought they saw a gas pump behind the rural mobile home belonging to Jerry Alday and Mary Alday and stopped to investigate it. They discovered there was no pump; however, the trailer was empty, and they decided to burglarize it. Dungee remained in the car while the defendant and Wayne Coleman entered the trailer. While they were inside, Billy Isaacs warned them two men were approaching in a jeep.

Jerry Alday and his father Ned Alday pulled in behind the trailer, unaware that it was being burglarized. Carl Isaacs met them and ordered them inside at gunpoint. After their pockets were emptied, Jerry Alday was taken into the south bedroom of the trailer while Ned was taken to the north bedroom. Carl Isaacs shot and killed Jerry Alday, and then both he and Coleman shot and killed Ned Alday.

Soon afterward, Jimmy Alday (Jerry Alday's brother) drove up on a tractor, walked to the back door, and knocked on the door. Coleman answered the door, "stuck a pistol up in the guy's face," and ordered him inside. He was taken into the living room and forced to lie on the sofa. Carl Isaacs shot and killed him.

After Carl Isaacs went outside to move the tractor, which was parked in front of their car, Mary Alday (Jerry Alday's wife) drove up. Carl Isaacs entered the trailer behind her and accosted her. Meanwhile, Chester Alday (Jerry Alday's brother) and Aubrey Alday (Jerry Alday's uncle) drove up in a pickup truck. Leaving Coleman and Dungee to watch Mary Alday, Carl and Billy Isaacs went outside to confront the two men, and forced them at gunpoint into the trailer. Once inside, Aubrey was taken to the south bedroom where Carl Isaacs shot and killed him, while Chester Alday was taken to the north bedroom and killed by Coleman.

Coleman and Carl Isaacs raped Mary Alday on her kitchen table. Afterward, they drove to a heavily wooded area several miles away where Mary Alday was raped again. Dungee killed her. They aban-

---

Judge Lawson granted a change of venue to Houston County and quashed the Seminole County indictment. Isaacs was re-indicted in Houston County on August 17, 1987. The trial began on January 4, 1988, with the commencement of the voir dire proceedings, and ended on January 30, 1988, when the jury reached its verdict on the issue of sentence. A motion for new trial was timely filed, and heard on June 9, June 23 and June 30, 1988. The motion for new trial was denied on July 15, 1988. An appeal originally was docketed in this court on September 16, 1988. On motion by the defendant for a remand to complete the record, the case was remanded for that purpose on November 16, 1988. The case was redocketed in this court on February 27, 1989. Oral arguments were heard on June 13, 1989.

doned their car in the woods and took Mary Alday's car, which they later abandoned in Alabama. They stole another car there, and were arrested a few days later in West Virginia, in possession of guns later identified as the murder weapons, and property belonging to the victims.

After his original trial, Carl Isaacs was interviewed by a film maker who was producing a documentary about the case. The defendant admitted shooting Jerry, Ned, Aubrey and Jimmy Alday, raping Mary Alday, and burglarizing the trailer. These admissions were introduced in evidence at the retrial.

Carl Isaacs was convicted of six counts of murder. The evidence supports the verdict. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his first six enumerations of error, Isaacs complains of the grand jury deliberations. Specifically, he contends that he was entitled to a grand jury free from exposure to pre-trial publicity and that the trial court erred in refusing to voir dire the grand jurors extensively or to give them special instructions about their deliberations. He contends, in addition, that he should have been provided a transcript of the grand jury proceedings, that the indictment may have been based upon hearsay testimony and that the evidence was insufficient to support a true bill.

(a) We note:

> Generally, in the absence of a controlling statutory provision, a person is not disqualified or incompetent to serve as a grand juror by reason of bias or prejudice on his part, by the fact that he has heard or read about the case under investigation or has even formed or expressed an opinion as to the guilt of the accused, or by his interest in a prosecution other than a direct pecuniary interest. [Footnotes omitted.] [38 AmJur2d 951, Grand Jury, § 7.]

Our Code provides for a change of venue in a grand jury criminal investigation "when it appears that a qualified grand jury cannot be had. . . ." OCGA § 15-12-82 (a). However, bias, prejudice, and exposure to pre-trial publicity are not mentioned in the Code as possible grounds for disqualification of grand jurors.[2] Moreover, the grand jury generally is entitled to act upon its own information, however acquired. See *Groves v. State*, 73 Ga. 205 (1884).

But assuming, without deciding, that remedial action may be

---

[2] See OCGA §§ 15-12-60 (elected office-holders, convicted felons, and persons under age 18 not qualified) and 15-12-70 (persons related within the sixth degree to "any party interested in the result of the case" are disqualified).

necessary in some cases of alleged grand jury bias, we hold that the trial court's response in this case was sufficient. First, the court quashed the Seminole County indictment after granting a change of venue, and Isaacs was indicted in Houston County. Second, before any evidence was presented to the Houston County grand jury, the court conducted a limited voir dire of the grand jury concerning possible bias and excused one grand juror who had signed a petition in connection with the case. There was no error.

(b) Relying upon *United States v. Estepa*, 471 F2d 1132 (2nd Cir. 1972), Isaacs contends it is improper to base an indictment on hearsay evidence. In *Estepa*, the defendant's conviction was reversed and the indictment dismissed where the government introduced hearsay evidence in a manner that misled the grand jury into believing that it was first-hand evidence instead of hearsay. The reversal was not a consequence of the mere use of hearsay, but the *misleading* use of hearsay. *Estepa*, of course, is not binding authority in this state. See *Conner v. State*, 251 Ga. 113 (5) (303 SE2d 266) (1983). Moreover, "*Estepa* has not been met with great enthusiasm by the other courts of appeal." *Moore's Federal Practice* (2nd ed.), Vol 8 at 6-104. The rule in this state is:

[W]here . . . it appears that a competent witness or witnesses were sworn and examined before the grand jury by whom the indictment was preferred, a plea in abatement on the ground that it was found on insufficient evidence, or illegal evidence, or no evidence, *will not be sustained*, because it comes under the rule that no inquiry into the sufficiency or legality of the evidence is indulged. [*Felker v. State*, 252 Ga. 351, 366 (2 a) (314 SE2d 621) (1984) (quoting *Summers v. State*, 63 Ga. App. 445 (3) (11 SE2d 409) (1940)).]

Accord *Costello v. United States*, 350 U. S. 359 (76 SC 406, 100 LE 397) (1956) (holding that a contrary rule "would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by the technical rules." Id. 350 U. S. at 364).

A trial jury has found Carl Isaacs guilty beyond a reasonable doubt. Even if there was some error in the grand jury proceedings, the "verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendant[ ] with the offenses for which [he was] convicted." *United States v. Mechanik*, 475 U. S. 66, 67 (106 SC 938, 89 LE2d 50) (1986). Hence, any possible error has been rendered harmless.[3]

---

[3] *Vasquez v. Hillery*, 474 U. S. 254 (106 SC 617, 88 LE2d 598) (1986), cited by the

(c) A defendant is not entitled to a transcript of the grand jury proceedings. *Frazier v. State*, 257 Ga. 690 (6) (362 SE2d 351) (1987).

3. In enumerations of error 7 through 13, Isaacs raises issues concerning the grand and traverse jury arrays.

On November 2, 1987, the trial court heard evidence on the defendant's challenges to the jury arrays. The defendant contended, inter alia, that active-duty military personnel and their dependents are underrepresented on the grand and traverse jury lists in Houston County. At the conclusion of the hearing, the defendant asked that the evidence be held open so he could supplement his presentation. The court agreed to do so, ultimately setting December 28, 1987, as the deadline for supplementing the evidence on this issue.

At the December 28 hearing, the defendant asked for more time to "take the rough figures that we have been able to gather [as to the underrepresentation of military personnel] to get a qualified expert to put them in a statistical form that would be acceptable to the court and subject to cross-examination." The defendant conceded that he planned to present no evidence that military personnel are a cognizable group, and the court refused to grant a further continuance on this issue.

(a) Citing *Guest v. State*, 186 Ga. App. 318 (1) (367 SE2d 105) (1988), Isaacs contends the court erred by setting a deadline for disposing of his jury challenges because (he says) a jury challenge is timely filed any time prior to voir dire.

We agree that in the absence of a timely trial court directive to the contrary, a challenge to the traverse jury array is timely filed any time before the voir dire begins. *Guest v. State*, supra. However, trial courts retain the discretion—and commonly exercise it—to set a time certain by which pre-trial motions must be filed and heard. See, e.g., Rule 7.3 of the Superior Court Rules, Ga. Ct. & Bar Rules, p. 3-17. We do not find an abuse of discretion in this case. The issue was heard on November 2. The defendant had almost two additional months to supplement the record. We agree with the trial court "that the defense . . . had an adequate opportunity to support the motion."

Even if the record had been held open, the defendant could not have prevailed absent proof, which he concededly did not plan to offer, that active-duty military personnel are a cognizable group. See, e.g., *Willis v. Kemp*, 838 F2d 1510 (I) (11th Cir. 1988). Moreover, although it may not be determinative of the cognizability issue, it is persuasive that active-duty military personnel are barred from federal jury service by 28 USC § 1863 (b) (6), and, to our knowledge, no court has ever found a violation of the fair cross-section requirement based

---

defendant, is inapposite here. *United States v. Mechanik*, supra at 70 (fn. 1).

upon this exclusion.

The trial court did not err by denying Isaac's motion for continuance and by denying his challenges to the grand and traverse jury arrays. *Frazier v. State*, 257 Ga., supra at (2).

(b) The manner in which grand jury forepersons are selected in Houston County provides no basis upon which to reverse the defendant's conviction or dismiss his indictment. *Ingram v. State*, 253 Ga. 622 (1 c) (323 SE2d 801) (1984).

4. We decline to reconsider our holding in *Isaacs v. State*, 257 Ga. 798 (364 SE2d 567) (1988), concerning the effect of OCGA § 17-7-53.1.

5. OCGA § 15-12-164 is not unconstitutional for any reason asserted. See *Skipper v. State*, 257 Ga. 802 (8) (364 SE2d 835) (1988); *Jefferson v. State*, 256 Ga. 821 (4) (353 SE2d 468) (1987).

6. The appointment of assistant attorney general William Hill as a special assistant district attorney in this case was authorized under Rule 42.1 of the Uniform Superior Court Rules. Ga. Ct. and Bar Rules, p. 3-59. We perceive no conflict between Rule 42.1 and Article V, Sec. III, Par. IV of the Georgia Constitution. Cf. *State v. Cook*, 172 Ga. App. 433 (3) (323 SE2d 634) (1984).

7. Our death penalty laws are not unconstitutional for any reason alleged. The trial court did not err by refusing to appoint an additional attorney to assist the defendant in answering questions pursuant to the Unified Appeal Procedure. *Blankenship v. State*, 258 Ga. 43 (1) (365 SE2d 265) (1988). We do not agree with the defendant's contention that giving him the *opportunity* "to raise questions or objections concerning his counsel's assistance. . . ." *Sliger v. State*, 248 Ga. 316, 319 (282 SE2d 291) (1981), requires him "to make legal determinations that only a trained and experienced lawyer can do [sic]. . . ." Appellant's brief at p. 158.

8. Isaacs filed a pre-trial motion for bail, relying upon OCGA § 17-7-50, which provides that a defendant is entitled to bail as of right if he is not indicted within 90 days of confinement. Because Isaacs was indicted within 90 days of his original arrest, and because less than 90 days elapsed between the time the Seminole County indictments were quashed and Isaacs was reindicted in Houston County,[4] OCGA § 17-7-50 plainly did not entitle Isaacs to bail as a matter of right. The trial court properly denied the defendant's § 17-7-50 motion for bail.

Isaacs now argues that the trial court erred by "summarily" denying bail, pointing out that even if he was not entitled to bail as of right, under OCGA § 17-7-50, the superior court *may* grant bail in a

---

[4] See *Isaacs v. State*, supra, 257 Ga. at 799.

capital murder case pursuant to OCGA § 17-6-1 (e), provided the court can make certain findings relative to the risk of allowing the defendant's release on bail.

It is settled that "[a] court may . . . refuse bail in capital cases." *United States v. Salerno*, 481 U. S. 739 (107 SC 2095, 2104, 95 LE2d 697) (1987). Given Isaac's history of escapes and attempted escapes, his pre-trial statement that he would continue trying to escape, and the "considered presumption of generations of judges that a defendant in danger of execution has an extremely strong incentive to flee," *United States v. Salerno*, supra at 2110 (fn. 6) (Marshall, J., dissenting), the trial court would plainly have been entitled under OCGA § 17-6-1 (e) to deny bail on the record before it absent any compelling evidence to the contrary, which the defendant did not even try to present, since he did not invoke the provisions of OCGA § 17-6-1 at trial.

The trial court's denial of bail was not error.

9. Isaacs was interviewed about this crime by television reporter Mark Piccard after the original trial but before the retrial. Isaacs stated that if he had it to do over, he would commit the crime again. The state offered this evidence at the sentencing phase of the trial to show the defendant's lack of remorse.

Contrary to the defendant's contention, the defendant's remorse or lack thereof is a permissible area of inquiry during sentencing. *Fair v. State*, 245 Ga. 868 (4) (268 SE2d 316) (1980). Compare, cf., *United States v. Reed*, 882 F2d 147, 150-51 (5th Cir. 1989) (approving federal sentencing guidelines provision for reduction of sentence when defendant demonstrates "affirmative acceptance of personal responsibility" manifested by *"sincere contrition"* (emphasis supplied)).

Piccard's testimony was not otherwise inadmissible. See Division 30, post.

10. Consistent with the requirements of the Unified Appeal Procedure, the district attorney stated before the defendant was arraigned that he intended to seek the death penalty. There is no requirement that this announcement be furnished *in writing* to the defendant. See Rule II (A) (1) of the Unified Appeal Procedure, Ga. Ct. & Bar Rules, p. 9-4.

11. Isaacs contends that exculpatory evidence known to the prosecution but unknown to the defense was suppressed. See *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

Billy Isaacs was interviewed in West Virginia by the FBI on May 18, 1973. His statement was reduced by the FBI to a six-page typewritten summary. A page and a half of this summary describes the Seminole County murders that are the subject of this trial. The district attorney stated at trial that he was unaware Billy Isaacs had given a statement to the FBI until he testified in this trial.

Some courts have held

that the prosecution cannot respond to a *specific* request for clearly material and exculpatory material in the possession of some totally independent agency by simply noting that it has no control over that agency; the prosecution has an obligation to at least make a good faith effort to seek defense access to that evidence. [Emphasize supplied.] [LaFave and Israel, Criminal Procedure, Vol. 2, § 19.5 (1988 pocket part at 135).]

Even if that were the rule in this state, Isaacs did not make a *specific* pretrial request for statements given by Billy Isaacs to the FBI. Absent a specific request directing the prosecutor's attention to such material, we will not impute to a Georgia prosecutor knowledge of evidence in the possession of the Federal government where the record shows no actual knowledge by the prosecutor that such evidence existed. *United States v. Meros*, 866 F2d 1304 (1) (11th Cir. 1989).

As for other information Isaacs contends was suppressed: A pretrial statement by co-defendant Coleman was not exculpatory; notes from which the official case report was made were cumulative of the information the defendant already had access to and do not create a reasonable doubt that did not otherwise exist; and the existence of a federal civil action concerning death-row inmate access to chaplain visits simply is not *Brady* material. See *Williams v. State*, 250 Ga. 463 (298 SE2d 492) (1983).

There was no *Brady* violation in this case.

12. The trial court properly denied the defendant's request for disclosure of the confidential prison and parole file of Billy Isaacs, which the defendant claimed would be useful for impeachment purposes when Billy Isaacs testified. OCGA § 42-9-53; *Potts v. State*, 259 Ga. 96 (10) (376 SE2d 851) (1989); *Pennsylvania v. Ritchie*, 480 U. S. 39 (107 SC 989, 94 LE2d 40) (1987).

13. In his 16th through 32nd (and part of his 11th) enumerations of error, Isaacs complains of the denial of funds.

Isaacs requested funds for an independent psychiatric evaluation; a pathologist; investigative assistance by a representative of the National Center on Institutions and Alternatives in Alexandria, Virginia; a statistician to help with his jury challenges; a fingerprint expert; a ballistics expert; and an investigator. The trial court granted funds for an independent psychiatric evaluation, and there is no issue about this request for funds. The court did not specifically award funds on any of the other requests, but did authorize the payment of $4000 to the defense, to use as it saw fit in the preparation and investigation of the case.

With these funds, Isaacs retained the services of Hans Selvog, the director of the Southeastern Regional Office for the National Center

on Institutions and Alternatives. Selvog conducted a comprehensive background investigation of the defendant and testified on the defendant's behalf at the sentencing phase of the trial. Isaacs also obtained the services of the Center for Rehabilitation and Therapy, Inc., to assist him with his challenges to the jury arrays and with the selection of the trial jury.

(a) Equal protection doctrine does not require that an indigent defendant be provided funds for expert assistance simply because the state is assisted by experts. See *Pope v. State*, 256 Ga. 195 (8) (345 SE2d 831) (1986). However, as we have noted, in an appropriate case, based upon a sufficient showing of need, the denial of funds for expert assistance might violate due process. *Crawford v. State*, 257 Ga. 681 (5) (362 SE2d 201) (1987).

(b) Isaacs obtained the services of an expert to assist him with his challenges to the jury array and with the selection of the jury, and obtained the assistance of the National Center on Institutions and Alternatives. No necessary assistance was denied here. See *Jarrells v. State*, 258 Ga. 833 (15) (fn. 3) (375 SE2d 842) (1989).

(c) Two attorneys were appointed to represent Isaacs over a year before the trial. They had a copy of the transcript of the previous trial, as well as access to the state's file. No limit was placed on the hours they would be paid for investigating and preparing for the case.

Five of the victims in this case were shot in the head. One was shot in the spine. Isaacs does not suggest how the autopsist's testimony about the cause of death of each of these victims might have been erroneous or questionable, or how a defense pathologist might have contributed information or analysis critical to the defense.

Likewise the defendant has not shown the necessity for a defense ballistics or fingerprint expert. Such necessity is not shown merely by noting that the defendant's attorney is not himself an expert and suggesting in general terms that a defense expert could help the defendant cross-examine the state's expert. Cf. *Moore v. Kemp*, 809 F2d 702, 712 (11th Cir. 1987).

Isaacs has not shown a reasonable probability that the assistance of a pathologist, ballistics expert, fingerprint expert, or an investigator (in addition to the investigative assistance provided by the National Center on Institutions and Alternatives) was necessary to his defense or that without such assistance his trial was rendered unfair. *Roseboro v. State*, 258 Ga. 39, 41 (fn. 3) (365 SE2d 115) (1988).

14. There was no error in the denial of continuance. The record shows that the defendant had ample time to prepare for trial and was prepared for trial.

15. As noted previously, in Div. (2 a), ante, a change of venue was granted and the case was moved from Seminole County to Houston County for trial. After the move, Isaacs again sought a change of

venue, claiming that because of pretrial publicity, he could not get a fair trial in Houston County.

Isaacs contends the "presumed prejudice" standard should apply here as it did to the original Seminole County trial. See *Isaacs v. Kemp*, 778 F2d, supra; *Coleman v. Kemp*, 778 F2d 1487 (11th Cir. 1985). We disagree. As is noted in *Coleman*, the "presumed prejudice standard is 'rarely' applicable. . . ." *Coleman v. Kemp*, supra at 1490. Houston County was not subjected to an inundation of inflammatory pretrial publicity comparable to that which pervaded Seminole County before the original trial in this case. Moreover, the crime was not committed in Houston County, and was 15 years old when the case was tried the second time. Compare *Patton v. Yount*, 467 U. S. 1025 (104 SC 2885, 81 LE2d 847) (1984). The defendant comes close to contending his case is so notorious it can never be tried anywhere in this state. We do not agree, and find the presumed prejudice standard inapplicable.

Where the presumed prejudice standard does not apply, the defendant can prevail on a motion for change of venue based on excessive pretrial publicity only if he can show actual prejudice "from the jury selection process itself—the voir dire examination and qualification of prospective jurors." *Lee v. State*, 258 Ga. 82, 86 (365 SE2d 99) (1988).

After an extensive and thorough voir dire examination of the prospective jurors, during which less than a fourth of the total number were excused for cause as a result of bias, prejudice, or fixed opinion, the trial court denied the defendant's motion for change of venue, ruling that "a fair and impartial jury has been impanelled to try this case" and that "this defendant may be fairly and impartially tried in Houston County." This finding is entitled to great deference, and we do not find it to be erroneous. Compare *Devier v. State*, 253 Ga. 604 (4) (323 SE2d 150) (1984).

16. On July 28, 1980, four death-row inmates escaped from custody. Carl Isaacs masterminded the escape but did not join the escapees because he was transferred to another prison less than two hours before the inmates had planned to leave. Isaacs was interviewed several times about his part in the escape attempt, and wrote a 46-page statement outlining his participation. In the introductory paragraphs, Isaacs stated:

Herein lies the truthful story of one of the greatest escapes that has ever been recorded in the annuls [sic] of history, perhaps it could even be the greatest.

Isaacs went on to describe how he had befriended persons on the outside, including a woman who had seen his picture in the paper and

had "fallen in love" with him. He enlisted the aid of other inmates, some of whom he managed to have moved into his cellblock. Relying upon his outside acquaintances and theirs, they successfully smuggled into prison hacksaw blades, pajamas, shoes, belts and other items. The plan was to cut enough bars that all the prisoners involved could get out of their cells, through a fire escape door onto a catwalk, and then through another window which led to a roof. They concealed the cuts in the bars with bubble gum, cardboard and paint until they were ready to go. In the meantime they made guard uniforms to wear during the escape, dyeing shoes, belts, and pajamas, making imitation badges and nightstick holders, and obtaining real flag patches from sources inside the prison.

On the morning of the escape, each man involved was to proceed to the catwalk, where he would be issued his "uniform." After donning their uniforms, the escapees were to proceed to the roof, where they would wait until 4:45 a.m., when a car would drive by to create a "diversion." They would climb or jump down to the first floor roof and wait until 4:50, when the car would drive by again, and they would jump to the ground. There was a shift change about this time, and they would simply walk in their guard uniforms to a car that was to be left for them in the parking lot and drive away.

At 3:30 a.m. on the day of the escape, a guard came to Isaacs' cell and told him to pack; he was going to be transferred. Rather than jeopardize the others' chance to escape, Isaacs decided to let himself be transferred.

In 1985, Isaacs was caught in another escape attempt. This attempt was similarly intricate, and involved smuggling hacksaw blades, paint, glue and other material into prison. He cut into a ventilation duct and planned to get from there outside the prison building. After cutting through the fence, he planned to proceed to an area a mile or so away where a friend had left him a "stash." He was caught when a guard noticed the vent in his cell was not quite the same color as the rest of the cell.

Isaacs was interviewed about this escape attempt by the GBI.

The statements given by Isaacs about his two escape attempts were introduced in evidence at the sentencing phase of the trial.

(a) Isaacs contends the statements were not voluntary, and were given because he was afraid for his life. As the state points out, the statements themselves are compelling evidence that they were voluntarily given by one who was proud of his accomplishments. Moreover, one of his own witnesses at the *Jackson-Denno* hearing testified:

> Your client [Isaacs] is lying to you and lying to this court. Man, there ain't nobody ever threatened that man. As a matter of fact, he's one of the best assets anybody has got

on death row. They get him in a cell block and they love him because he's an escape risk and everybody thinks he's a genius. . . .

He ain't never been forced to give a statement. He ain't never been forced to do nothing. He had so many guards on death row that loved him. . . .

Before Isaacs was interviewed by the GBI, he was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). The trial court did not err by finding the statements to have been given voluntarily, after a knowing, intelligent and voluntary waiver of his *Miranda* rights.

(b) Isaacs also contends the statements were improperly admitted in aggravation because they were evidence of crimes for which the defendant has not been convicted.

However:

As we held in *Devier v. State*, 253 Ga. 604 (9) (323 SE2d 150) (1984), a prior crime may be proven in aggravation despite the lack of a conviction, so long as there has not been a previous acquittal. See *Fugitt v. State*, 256 Ga. 292 (1 d) (348 SE2d 451) (1986). [*Jefferson v. State*, 256 Ga. 821, supra at (8 b).]

See also *Potts v. State*, 259 Ga. at (14). Evidence of the defendant's escape attempts was properly admitted in evidence at the sentencing phase of the trial. *Hicks v. State*, 256 Ga. 715 (19 c) (352 SE2d 762) (1987).

17. Before the original trial, Billy Isaacs reached an agreement with the state that, in exchange for his testimony against the other defendants in the case and his guilty plea to burglary and armed robbery, the other charges against him would be dropped and he would receive immunity from prosecution on any and all other criminal offenses committed within this state as of November 1, 1973.

The defense was aware of this agreement prior to the retrial, but filed a motion seeking the revelation of any further "deal" for Billy Isaacs' testimony at the retrial. The prosecutor stated there was none, and Billy testified at trial:

The very first time I met Mr. Ferguson, I asked him if there was some way that he would make a deal with me for me to be turned loose. The man stated . . . no, he could not, that he was not going to make any deals, promises, or insinuations in any way whatsoever.

The defendant contends a letter Billy Isaacs wrote after the trial to the Governor of Maryland (where he has additional time to serve after he completes serving his Georgia sentences), proves there was an understanding between the state and Billy Isaacs, the suppression of which entitles him to a new trial.

Billy Isaacs admitted during the trial that

> I certainly have a lot of hopes that something will be done for me when this is all over with. That is what has helped me to keep me and my sanity for 15 years—hope.

The letter he wrote to the Governor of Maryland proves no more than that he hoped his cooperation in this trial could help him later.

The defendant has shown no suppression of any understanding or agreement for prosecutorial leniency, *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972), and no grounds for reversal. See *Fugitt v. State*, 256 Ga. 292 (2) (348 SE2d 451) (1986).[5]

18. Citing *March v. State*, 458 S2d 308 (Fla. App. 1984) and *State v. Delahoussaye*, 443 S2d 648 (La. App. 1983), the defendant contends it was reversible error to open the trial with a prayer.

The record shows that at 9:30 a.m. on the first day of the trial proceedings, before the voir dire examination began, and 26 days before the trial ended, there was an invocation. The record does not disclose the contents of the invocation or identify the person delivering it, even though this appeal was remanded to the trial court for completion of the record. See footnote 1, ante.

An invocation is not prejudicial *per se*, and the defendant has not shown that this particular invocation was prejudicial. *United States v. Walker*, 696 F2d 277 (V) (4th Cir. 1983).

19. The defendant has shown no error in the manner in which the court excused prospective jurors before trial. *Ingram v. State*, 253 Ga. 622, supra at (1 e).

20. In enumerations 40 through 53, Isaacs contends that 14 prospective jurors were "factually biased" and should have been excused for cause. We note that one of those prospective jurors (enumeration 48) was excused for cause. Trial transcript at 2097. In addition, the defendant declined the trial court's offer to excuse another of these prospective jurors (enumeration 46) who was selected as a juror. Trial transcript at 3869.

We find no error in the trial court's determination that the remaining 12 prospective jurors were qualified to serve. *Waters v. State*,

---

[5] In addition, we note that, especially in light of the defendant's own statements about the crime (see Div. 30, post), we do not agree that Billy's "testimony as to who shot the victims . . . was essential" to establish the defendant's involvement in the crime.

248 Ga. 355 (2) (283 SE2d 238) (1981).

21. In enumerations of error 54 through 69, Isaacs contends that 16 prospective jurors should have been excused on "reverse-*Witherspoon*" grounds, i.e., because they were unable "fairly to consider a life sentence." *Childs v. State*, 257 Ga. 243, 249 (7) (357 SE2d 48) (1987).[6]

Initially, we note the trial court excused several prospective jurors on this ground.[7] As in *Childs v. State*, supra, the "trial court recognized that an inability fairly to consider a life sentence is just as disqualifying as an inability fairly to consider a death sentence." Ibid. Compare *Skipper v. State*, 257 Ga. 802, supra at (8).

Two of these 16 prospective jurors (enumerations 58 and 59) were not challenged for cause by the defendant. Another (enumeration 62) was excused for cause, trial transcript at 2097, mooting any possible reverse-*Witherspoon* error. Having reviewed the voir dire testimony of the remaining 13 prospective jurors, we do not find erroneous the trial court's finding that they were qualified to serve.

> Although their answers were to some degree inconsistent . . . the trial court did not err by concluding that the "final distillation" (*Spivey v. State*, [253 Ga. 187, 197 (fn. 3) (319 SE2d 420) (1984)]) of their thought processes did not show a disqualifying bias or predisposition to impose a death sentence. [*Curry v. State*, 255 Ga. 215, 221 (2 f) (336 SE2d 762) (1985).]

22. In enumerations 70 through 72 and 74 through 81, Isaacs contends the trial court erred by excusing 11 prospective jurors on "*Witherspoon*" grounds, i.e., because they were unable fairly to consider the imposition of a death sentence.

The excusals at issue here were "within the deference due the trial judge's determination," *Jefferson v. State*, 256 Ga., supra at 824 (2). These prospective jurors were properly excused under the standard set in *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985).

23. In enumeration 73, Isaacs contends the court erred by allowing the state to ask a prospective juror whether she personally could "come in and say in open court that I impose a sentence of death by electrocution."

---

[6] Seven of these 16 enumerations of error involve prospective jurors dealt with in Div. 20 of this opinion. The defendant contends these seven were both factually biased *and* impermissibly biased in favor of a death sentence.

[7] Arguably as many as seven were excused on this ground, although some of them were probably disqualified also for other reasons.

In *Alderman v. Austin*, 663 F2d 558 (5th Cir., Unit B 1982), the predecessor to the Eleventh Circuit Court of Appeals held it was improper to excuse a prospective juror on *Witherspoon* grounds simply because the juror stated she would be unable to write out a verdict of death if selected as foreperson of the jury. The court noted that the juror had shown herself willing to vote for a death sentence, and held that an ability to sign a death sentence as *foreperson* was immaterial to the *Witherspoon* inquiry.

Pretermitting the extent to which *Alderman v. Austin* might still be persuasive now that *Wainwright v. Witt*, supra, has been decided, see *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985), we find no error here. It is true that service as foreperson is not "among every juror's duties," *Alderman v. Austin*, supra at 563, but agreeing to a sentencing verdict *is* a part of every juror's duty, since a poll of the jury is required at the sentencing phase of a death penalty trial. Unified Appeal Procedure, Rule III (B) (3) (b), Ga. Court and Bar Rules at 9-12. The state's question was proper.

24. In enumerations 82 through 90, Isaacs contends the court overly restricted the voir dire examination of nine prospective jurors (five of whom are also the subject of one or more enumerations of error dealt with in Divs. 20 and 21, ante).

There was no restriction of the voir dire of the first of these nine jurors (enumeration 82). The defendant's complaint is that the trial court allowed the state to ask the prospective juror whether it might be "difficult" for the juror to impose a death sentence. We agree with the defendant that an affirmative answer to this question would not be sufficient to disqualify the juror. *Alderman v. State*, supra, 254 Ga. at 207 (4). However, the juror was not disqualified on this or any other basis, and it was not an abuse of discretion to allow the state merely to ask the question. *Curry v. State*, supra, 255 Ga. at 218 (2 b).

Nor was there a restriction of the defense voir dire examination of the fourth of these prospective jurors (enumeration 85). The court simply ruled that the defendant himself could not ask a final voir dire question after his attorney had concluded his voir dire examination. This ruling was not error. Although a defendant has a right to represent himself, he does not have the right to act as co-counsel. *Hance v. Kemp*, 258 Ga. 649 (1) (373 SE2d 184) (1988). Even if the court allows a defendant to act as co-counsel, ibid., the court retains the discretion to require that only one of two or more co-counsel conduct the voir dire examination of each prospective juror.

There was no improper restriction of the voir dire examinations of the fifth of these prospective jurors (enumeration 86). A party is not entitled "to ask a juror to describe the *kind* of case that, in the juror's opinion, would warrant a death sentence." *Blankenship v.*

*State*, 258 Ga., supra at 45 (6).

Isaacs' remaining contentions about the restriction of voir dire primarily concern limitations on questioning about parole. The case on which he relies, *King v. Lynaugh*, 828 F2d 257 (5th Cir. 1987), was reversed in *King v. Lynaugh*, 850 F2d 1055 (5th Cir. 1988) (en banc). We find the en banc opinion more persuasive than the vacated panel opinion on which the defendant relies, and find no improper restriction of the voir dire examination, which fills over 2000 pages of transcript, not including the jury questionnaires each prospective juror filled out before entering the courtroom. *Curry v. State*, supra.

25. The state's use of peremptory challenges to excuse jurors not disqualified under *Wainwright v. Witt*, supra, does not give rise to a claim under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). Cf. *Foster v. State*, 258 Ga. 736 (2) (374 SE2d 188) (1988).

26. A photograph is authenticated by showing it is a fair and accurate representation of the scene depicted. *Johnson v. State*, 158 Ga. 192, 198 (2) (123 SE 120) (1924). Any witness who is familiar with the scene depicted can authenticate the photograph; it is not necessary that the witness be the photographer or even that the witness have been present when the photograph was taken. *Toler v. State*, 213 Ga. 12 (3) (96 SE2d 593) (1957). Hence, it was not necessary, as the defendant contends, that a chain of custody have been established for certain photographs admitted in evidence in this case.

27. During the cross-examination of Billy Isaacs, the defendant's attorney asked about alleged inconsistencies between prior testimony and that given at this trial. After asking Billy Isaacs about his testimony at a hearing involving co-defendant Coleman, and a statement he gave to the FBI, the defendant's attorney asked, "Have you ever testified under oath that you saw this man half on the floor?" Receiving an affirmative answer, he then asked, "What is the difference?" Billy Isaacs answered:

One thing I would like to point out is that at the time that I testified at my brother's original trial, I was very scared.

The defendant immediately moved for a mistrial, contending the answer violated the court's pre-trial ruling that the state should instruct its witnesses not to refer to the defendant's previous trial and conviction. The trial court denied the motion for mistrial but gave curative instructions.

Isaacs contends the court erred by denying the mistrial. We disagree. The defendant's questioning was not explicitly limited to previous testimony given elsewhere than at the defendant's first trial, and the witness reasonably could have believed his answer was responsive to the question. As we stated in *Felker v. State*, 252 Ga., supra at 377

(11), "one cannot take chances in propounding questions which may elicit damaging answers, otherwise inadmissible, and then demand a mistrial when such answer is given."

28. The trial court did not err in qualifying Kelly Fite of the state crime laboratory as an expert in toolmark and firearms examination, nor in admitting in evidence a properly authenticated photograph of a gun—no longer available—that Fite tested before the first trial of this case.

29. For reasons stated in *Griffin v. State*, 183 Ga. App. 386 (1) (358 SE2d 917) (1987), enumeration 96 is without merit.

30. In 1976, film maker Fleming Fuller interviewed several death-row inmates, including Carl Isaacs, in connection with a public-television documentary called "Murder One" that aired in May of 1977. Later, Fuller considered making a feature film about Isaacs' crime. He interviewed Billy Isaacs in the spring of 1978, and came to believe that Billy had not killed anyone, contrary to what Carl Isaacs had said to Fuller earlier. Fuller decided to re-interview Isaacs "to compare the stories that Carl and Billy were telling to see how they coincided. . . ." When he talked to Carl Isaacs again, "he was very open and cooperative, and the stories that he told me did in fact coincide to an extraordinary degree with the story that Billy had told me." These conversations were recorded by Fuller on an audio cassette tape recorder.

Portions of the tape (relating specifically to the crime on trial) were played to the jury at the guilt phase of the trial.

(a) We find that a proper foundation was laid for playing the tape to the jury. *Solomon, Inc. v. Edgar*, 92 Ga. App. 207 (3) (88 SE2d 167) (1955). Fuller testified that no changes, additions or deletions had been made to the tape since it was recorded. That the tape recorder was not on the entire time he talked to Isaacs does not mean the tape was inadmissible. The defendant was free to cross-examine Fuller about any portions of the interview that were not recorded. *Smalls v. State*, 105 Ga. 669 (1) (31 SE 571) (1898).

(b) There is no evidence Fuller was acting as an agent of the state, or that Isaacs' statement was not voluntary. The court did not err by allowing the tape to be played to the jury. *Berryhill v. State*, 249 Ga. 442 (10) (291 SE2d 685) (1982).

31. Pretermitting whether the record would even support a finding that Billy Isaacs and three witnesses from the state crime laboratory committed perjury, the record certainly does not demand such a finding. The trial court properly submitted the issue of their credibility to the jury. *Fugitt v. State*, 256 Ga. 292, supra (6).

32. There is no merit to enumerations 101 through 123. The items involved either were tangible objects, and no chain of custody need have been shown, or were properly admitted after a chain of

custody was established. *Harper v. State*, 251 Ga. 183 (1) (304 SE2d 693) (1983).

33. The admission of two photographs showing, respectively, the bodies of Mary Alday and Ned Alday, was not error. *Brooks v. State*, 258 Ga. 20, 22 (3) (365 SE2d 87) (1988). See also *Hicks v. State*, 256 Ga. 715, supra at (13).

34. Evidence that the defendant stole a car in Livingston, Alabama, after abandoning Mary Alday's car was properly admitted. *Moon v. State*, 258 Ga. 748 (13) (375 SE2d 442) (1988).

35. In enumerations 128 through 132, Isaacs complains of various portions of the guilt-phase jury instructions.

(a) The court's instructions on credibility of witnesses were not impermissibly burden-shifting. *Noggle v. State*, 256 Ga. 383 (4) (349 SE2d 175) (1986).

(b) The trial court instructed the jury that certain inferences could be drawn as to intent. Citing *Powell v. State*, 187 Ga. App. 878 (4) (372 SE2d 234) (1988), the defendant argues that substituting "inferences" for "presumptions" in a jury charge is not sufficient to remedy a charge otherwise unconstitutional under *Sandstrom v. Montana*, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979).

In *Powell v. State*, supra, the trial court instructed the jury:

"The law infers that a person intends to accomplish the natural and probable consequences of his acts and if a person uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily used and thereby causes the death of a human being, the law infers the intent to kill. These inferences may be rebutted however." [Id. at 879.]

We agree that merely substituting "inference" terminology for "presumption" terminology is not necessarily sufficient to "clean up" an instruction invalid under *Sandstrom v. Montana*, supra, and *Francis v. Franklin*, 471 U. S. 307 (105 SC 1965, 85 LE2d 344) (1985). That does not mean, however, that a jury instruction containing inference terminology is constitutionally improper.

A presumption or inference is an evidentiary device which authorizes the jury to find the existence of a fact from proof of one or more other facts. Such devices are not invalid *per se*. See, e.g., *Ulster County v. Allen*, 442 U. S. 140, 156 (99 SC 2213, 60 LE2d 777) (1979). However, a device may not, consistent with the constitutional requirement that a criminal defendant's guilt must be proven beyond a reasonable doubt, lessen or shift the state's burden of proof. *Sandstrom v. Montana*, supra. Whether an evidentiary device has such an impermissible effect depends upon whether it is permissive or mandatory.

A permissive device is valid if it is rational. *Williamson v. State*, 248 Ga. 47 (281 SE2d 512) (1981). A *mandatory* inference or presumption concerning an element of the offense is invalid, and this is so whether it is mandatory-conclusive or mandatory-rebuttable. *Sandstrom v. Montana*, supra, 442 U. S. at 524.[8]

Although the term " 'inference' has tended to be used more frequently [than the term 'presumption'] for evidentiary devices that are permissive in nature," *Lamb v. Jernigan*, 683 F2d 1332, 1335-36 (fn. 4) (11th Cir. 1982), use of either term is *not* conclusive of whether the device is permissive or mandatory. An "inference" can be mandatory, and a "presumption" may be permissive. Id.

Whether the device is permissive or mandatory may be determined as follows:

> A permissive inference is an evidentiary device that permits, but does not require, the jury to infer the elemental fact from proof by the prosecutor of the basic fact. By contrast, a mandatory presumption instructs the jury that it must infer the elemental fact once the state has proved the basic fact. The difference between the two may be found in the presence or absence of "language of command" such as 'shall be.' An instruction containing a mandatory presumption commands that the jury reach a particular conclusion, while an instruction couched in terms of an inference merely suggests, but does not command, that the jury do so. Since a permissive inference does not require the jury to reach a certain conclusion, it does not affect the burden of proof, and therefore must meet only the 'rational connection' test. A mandatory presumption, however, eases the prosecution's burden and, therefore, implicates both the 'rational connection' test and the requirement that the prosecution prove every element of the offense beyond a reasonable doubt. [Doyel, Burden-Shifting Criminal Jury Instructions in Georgia, 38 Mer. L. R. 1, 4 (1988) (footnotes omitted).]

It can be seen that a jury instruction stating "the *law infers* fact x from fact y" is just as mandatory as an instruction that "the *law presumes* fact x from fact y." In either event, the jury is told that a finding of fact x legally follows from proof of fact y.

Isaacs contends the instructions in this case are as defective as

---

[8] There is a possible exception: A mandatory rebuttable presumption that only shifts the burden of *production* but not the burden of *proof* might survive constitutional scrutiny. See *Williams v. Kemp*, 255 Ga. 380, 381 (338 SE2d 669) (1986). In the overwhelming majority of presumption cases, however, this possible exception need not concern us.

those in *Powell v. State,* supra, because in both cases the court merely substituted "inference" terminology for "presumption" terminology in instructions otherwise invalid under *Sandstrom.* However, in *Powell,* the sole change made to language taken from a pre-*Sandstrom* case was the substitution of the word "infers" for the word "presumes." No other changes were made, and the "language of command" was retained. Such "language of command" is absent from the instructions on criminal intent in this case. Phrases such as "intent may be inferred . . .," or "it is reasonable to infer . . .," or "you may draw the inference that . . .," are clearly permissive in nature. There was no violation of *Sandstrom. Hill v. Kemp,* 833 F2d 927 (11th Cir. 1987).

(c) The court charged the jury:

It is your duty and responsibility to decide the truth of the case from a factual standpoint from the evidence submitted to you. The state contends that the true facts of this matter are one thing, *the defendant contends that the true facts are another way.* It is your duty to decide what the true facts are from the evidence, and only from the evidence presented before you in this trial. [Emphasis supplied.]

The defendant argues this charge was improper because the defendant has no burden to contend or prove anything.

The defendant contended he was not guilty when he entered his plea. We do not see how the charge implies anything about the burden of proof, and find no error in the charge.

(d) The court's charge on flight was not erroneous. *Pollard v. State,* 249 Ga. 21 (3) (287 SE2d 189) (1982).

36. Isaacs contends that certain slide photographs admitted in evidence at the sentencing phase of the trial were not sufficiently authenticated. We find that the scenes depicted were sufficiently identified to overcome a foundation objection to their admissibility. Cf. *Pruitt v. State,* 258 Ga. 583 (4) (373 SE2d 192) (1988).

37. As noted previously, Ham Selvog, of the National Center on Institutions and Alternatives conducted a background investigation of the defendant, and testified on behalf of the defendant at the sentencing phase of the trial. His testimony included the presentation of a videotaped interview of the defendant's father, who now lives in Tennessee, and a summary of information he obtained about the defendant's childhood from neighbors, social workers, school records, foster parents, juvenile detention records, and other public records. During colloquy about his testimony outside the presence of the jury, the court stated:

Ninety-nine point nine [percent] of what this witness has said is rank hearsay. You know that, I know that, Mr. Ferguson [the D.A.] knows that. If Mr. Ferguson does not object to it, and the court is not suggesting that he should, then the court has no objection to it.

Virtually all of Selvog's testimony, which fills over 120 pages of the transcript, was admitted without objection.

The defendant complains of two instances in which the court sustained a state's objection to Selvog's testimony. In the first instance, the court excluded a letter written to Selvog in 1988 by an assistant principal who once knew Carl Isaacs. This half-page letter contains its author's hope that it would offer "some type of consolation" to the defendant, and a request that Selvog would tell the defendant he said hello. In the second instance, the court excluded testimony about a 1973 report entitled "A Call for Reform of Maryland's Training Schools."

Relying on *Green v. Georgia*, 442 U. S. 95 (99 SC 2150, 60 LE2d 738) (1979), Isaacs contends it was error to exclude this evidence. We do not agree. *Green* does not, as the defendant contends, hold that a defendant's hearsay evidence must be admitted at the sentencing phase of a death penalty case. *Alderman v. State*, 254 Ga. 206, supra at (7). In this case the court did not mechanistically apply the hearsay rule to exclude defense evidence in mitigation that the state had considered reliable enough to use in aggravation in a co-defendant's case. The "unique circumstances" described in *Green* are not present here, and it cannot reasonably be said that the hearsay rule was "applied mechanistically to defeat the ends of justice." Id.

38. Any error in the court's comment while ruling on the admissibility of evidence that the defendant was "present" and could "speak for himself if he chooses" was rendered harmless by the court's curative instructions.

39. It was not error to allow the state to present the testimony of two witnesses in rebuttal who were not on the state's list of witnesses. *White v. State*, 253 Ga. 106 (3) (317 SE2d 196) (1984).

40. A defendant no longer has the right to give an unsworn statement. 1973 Ga. Laws 292, § 2. Isaacs could have testified subject to being cross-examined at the sentencing phase of the trial if he chose, OCGA § 24-9-20, but the court did not err by refusing to allow him to make an unsworn statement.

41. Isaacs

did not object at trial to the prosecutor's [sentencing-phase] closing argument and, having reviewed the complaints he now makes on appeal, we conclude the prosecutor's argu-

ments "did not result in the sentence of death being imposed under the influence of passion, prejudice, or any other arbitrary factor." [Cits.] [*Kinsman v. State*, 259 Ga. 89, 92 (11) (376 SE2d 845) (1989).]

42. For reasons discussed in Div. 9, ante, there is no merit to enumeration of error 139.

43. In enumerations 140 through 147, Isaacs complains about various portions of the sentencing-phase charge.

(a) "[T]he doctrine of 'mutually supporting aggravating circumstances' precludes imposition of *two* death sentences where the sole statutory aggravating circumstance is that the defendant has committed a double murder." *Putman v. State*, 251 Ga. 605, 614 (12) (308 SE2d 145) (1983). However, the jury may impose a death sentence for each murder in a multiple-murder case where each murder is supported by an independent statutory aggravating circumstance. In *Putman*, for example, both murders were aggravated because they involved the commission of an armed robbery. Ibid. There is no merit, then, to Isaacs' argument that it was improper to support each death penalty in this case by the statutory aggravating circumstance that each murder was committed by a person who had escaped from lawful confinement, OCGA § 17-10-30 (b) (9), and to support each death sentence by the statutory aggravating circumstance that each murder was committed during the commission of armed robbery and burglary. OCGA § 17-10-30 (b) (2). Compare *Lee v. State*, 258 Ga. 762 (8) (374 SE2d 199) (1988); *Lonchar v. State*, 258 Ga. 447 (9) (369 SE2d 749) (1988); *Frazier v. State*, 257 Ga. 690, supra at (27); *Ford v. State*, 257 Ga. 461 (1) (360 SE2d 258) (1987); *Blanks v. State*, 254 Ga. 420 (9) (330 SE2d 575) (1985); *Finney v. State*, 253 Ga. 346 (7) (320 SE2d 147) (1984); *Wilson v. State*, 250 Ga. 630 (9) (300 SE2d 640) (1983); *Putman v. State*, supra.

(b) The court's charge on the § b (7) statutory aggravating circumstance was not erroneous. *West v. State*, 252 Ga. 156 (Appendix) (313 SE2d 67) (1984).

(c) The defendant's request to charge number 4 was covered in substance by the court's charge. The refusal to give the defendant's request to charge was not error. *Pruitt v. State*, 258 Ga., supra at (13).

(d) Enumeration of error number 143 is answered contrary to the defendant's position by *Moon v. State*, 258 Ga., supra at 759-60 (33).

(e) The court did not err by refusing to tell the jury that if it could not reach a unanimous verdict, it should notify the court in written form: "We, the jury, are not able to reach a unanimous decision." Cf. *Romine v. State*, 256 Ga. 521 (1) (350 SE2d 446) (1986).

(f) The court did not err by telling the jury that although it could

properly consider "feelings of sympathy and mercy for the defendant," *Legare v. State*, 250 Ga. 875 (2) (302 SE2d 351) (1983), it should not act on "whim or caprice." Cf. *Williams v. State*, 258 Ga. 281, 290 (11) (368 SE2d 742) (1988).

(g) Enumeration of error number 146 is answered contrary to the defendant's position by *Spraggins v. State*, 255 Ga. 195 (336 SE2d 227) (1985).

(h) The court clearly instructed the jury that its "recommendation" of sentence would be binding on the court. There was no error here. *Moon v. State*, supra, 258 Ga. at 760 (34).

44. Enumerations 149 through 153 raise issues concerning the jury's sentencing-phase deliberations.

The jury began its sentencing deliberations at 2:00 p.m. Friday afternoon. At 7:10 p.m., a note was delivered to the court that one juror had become ill, and another was upset. The juror who had become ill was taken to the hospital. Ten of the jurors were sent to supper, and the trial judge, accompanied by a court reporter, entered the jury room and talked to the juror who had been reported to be upset. A transcript of this conversation was furnished to both parties the next morning. It is set out, in full, in Appendix A of this opinion. To summarize, however, the juror stated she was upset because she was not sure she was "capable" of voting for a death sentence. The court told her she was entitled to vote her decision whatever it was, and that she had no reason to be ashamed or feel defensive about it. The juror stated she did not know how she wanted to vote, and the court told her she did not have to make her mind up that evening, and that the deliberations would be adjourned until the morning.

The next morning, the court consulted a doctor concerning the juror who had been taken to a hospital. The doctor's diagnosis was that she was physically unable to continue. The court excused her and replaced her with an alternate.

The jury was instructed to begin its deliberations anew so the alternate juror could participate in all decisions the jury was to make.

Several jurors complained that it had been too hot in the jury room. The court discovered that the thermostat controlling the temperature in the jury room had been set incorrectly the previous evening, but the temperature was now set correctly.

Jury deliberations began shortly before 9:30 a.m. The jury reached a verdict at 11:20 a.m. The jurors were polled, and all the jurors stated their agreement with the verdict.

(a) Isaacs contends the court erred by refusing to allow him to question the remaining jurors after the court questioned the one juror in the jury room. But all of the jurors and alternates testified at the hearing on the motion for new trial. The defendant was not denied an evidentiary opportunity to develop issues raised by the situation.

(b) Isaacs contends the court erred by replacing the juror who was ill with an alternate juror. We do not agree. According to testimony presented at the hearing on the motion for new trial:

[The juror] had been sick all week long and she was telling us if we can just get through this, you know, then I can hold out. We kept telling her that you need to go to the doctor. She said no, I can hold out, you know, and she kept trying to hold out long enough for the trial to be over. . . .

She fainted, however, on Friday evening. The court properly excused her after she was examined by a doctor who reported to the court that in his opinion she was physically unable to continue.

(c) The court did not improperly limit the defendant's evidentiary presentation at the motion-for-new-trial hearing. He was allowed to explore all relevant matters. *Rushen v. Spain*, 464 U. S. 114, 121 (fn. 5) (104 SC 453, 78 LE2d 267) (1983).

(d) The testimony presented at the hearing supports the trial court's finding that there were no improper communications between the regular jurors and the alternates.

(e) When the juror who was upset talked to the trial judge on Friday evening, she related that "somebody talked about having two sisters killed and the drunk driver got off; then another girl said she was molested."

The juror who was molested testified that she had not disclosed the information on her jury questionnaire because she simply had not thought about it while she was filling it out. She testified that she had no real memories of it, because she had "totally blocked out most of my childhood" and was "still not real sure what happened." During the jury deliberations, the juror had told the other jurors only

that just because an individual had been abused as a child didn't necessarily mean that they would turn to a life of crime . . . because I myself was abused as a child.

The other juror testified that two of his friends were killed by a drunk driver. Although he had noted on his jury questionnaire that a good friend of his—a former deputy sheriff—had been murdered by an escaped convict, he had not listed the automobile accident on the questionnaire because he did not think about it. He testified that he was not as close to the two friends who had died in the automobile accident as he had been to the one who was murdered.

The defendant contends that if the two jurors referred to had revealed this information during the voir dire examination, he would have moved to strike them for cause, or at least challenged them peremptorily, and that he is entitled to a new trial. We disagree.

To invalidate the result of a 3-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination. . . . We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial. [*McDonough Power Equipment, Inc., v. Greenwood*, 464 U. S. 548, 555-56 (104 SC 845, 78 LE2d 663) (1984).]

"Although *McDonough* was a civil case, its test has been applied in criminal cases. [Cit.]" *United States v. O'Neill*, 767 F2d 780, 785 (11th Cir. 1985). We find it persuasive.

We agree with the trial court's finding that neither juror was dishonest during the voir dire examination. Moreover, in view of their overall testimony, including their belief that the incidents did not affect their ability to be fair and impartial jurors, we do not find that either would have been excludable for cause if the information had been disclosed before trial. The defendant is not entitled to a new trial on this ground.

(f) The defendant contends that he nevertheless is entitled to a new trial because the jury considered matters not in evidence during its deliberations. This contention is answered by *Hall v. State*, 259 Ga. 412 (3) (383 SE2d 128) (1989). As we noted in *Aguilar v. State*, 240 Ga. 830, 832 (1) (242 SE2d 620) (1978):

What goes on in the jury room is a complicated weighing process, in which the final unanimous verdict is merely the resultant of numerous competing forces. See generally H. Kalven & H. Zeisel, The American Jury (1966). Our statute . . . prohibits the jurors from impeaching their verdicts. . . . The purpose of the statute is plainly to prohibit after-the-fact picking at the negotiating positions of the jurors and of their attempts to persuade one another.

(g) Finally, Isaacs contends the court should have declared a mis-

trial Friday evening on the ground the jury was deadlocked. We held in *Romine v. State*, 256 Ga. 521, 525 (1 b) (350 SE2d 446) (1986) that "whether a jury is hopelessly deadlocked is an evaluation we commit to the sound discretion of the trial court, subject to appellate review for an abuse of discretion."

Isaacs contends that the juror who was upset Friday evening may have been coerced into reaching her verdict.

All of the jurors testified at the new trial hearing that it was unmercifully hot and stuffy in the jury room Friday evening. The juror who was upset testified that she felt pressure not from the other jurors, but because she "felt that we had to make a decision that Friday night . . . and I just wasn't ready to vote." After resting Friday night, and returning Saturday morning to a more comfortable jury room, she was prepared to vote. She testified that her verdict was free and voluntary.

The trial court's refusal to find the jury deadlocked Friday evening was not an abuse of discretion. The denial of a mistrial was not error.

45. The evidence supports the jury's findings of statutory aggravating circumstances. OCGA § 17-10-35 (c) (2). See Div. 43 (a) of this opinion, ante. Compare *Rivers v. State*, 250 Ga. 303 (8 d) (298 SE2d 1) (1982).

46. We do not find that the sentences of death were imposed under the influence of impermissible passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The sentences of death are neither excessive nor disproportionate to sentences imposed in similar cases, considering the crime and the defendant. The similar cases listed in the Appendix support the imposition of a death sentence in this case.

*Judgment affirmed. Marshall, C. J., Clarke, P. J., Smith, Gregory, Bell, JJ., and Judge Frank S. Cheatham concur. Weltner, J., disqualified.*

## APPENDIX.

*Lee v. State*, 258 Ga. 762 (374 SE2d 199) (1988); *Morrison v. State*, 258 Ga. 683 (373 SE2d 506) (1988); *Frazier v. State*, 257 Ga. 690 (362 SE2d 351) (1987); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640)

(1983); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State*, 239 Ga. 422 (238 SE2d 12) (1977); *Stephens v. State*, 237 Ga. 259 (227 SE2d 261) (1976); *Birt v. State*, 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State*, 233 Ga. 117 (210 SE2d 659) (1974).

Appendix A.

THE COURT: What do you want to tell me?

THE JUROR: Well, we voted on five of the cases and I agreed that everything—you know, they did. Well, I agreed on some of those counts on the paper. But for some reason, I couldn't vote death. I voted life. And it was one other voted life, too. And to me, I just couldn't make myself do death. But when I was polled, I thought I could; but when it came time to do it, I couldn't make myself do it. And I guess I considered his background and everything, and I just feel like I couldn't do it.

And we talked about it and people told personal things that didn't have anything to do with the case, and then they told about what the alternates felt, that they would vote guilty. And I just started feeling so like I wasn't capable of voting, you know, right. I felt that either I was going to vote because they said all four of the alternates, that they told another juror that they would vote guilty. And that somebody talked about having two sisters killed and the drunk driver got off; then another girl said she was molested. And things like that just ride at me so much that I just don't feel like I'm capable of doing anything no more. I feel like I'm just deadlocked. I don't know how to deal with it no more. And I don't know whether I can live with myself if I voted the death. I think it would hurt me in all ways. And then I just don't feel I'm capable of doing it.

THE COURT: Well, let me ask you this. How would you feel if we stopped for the day and you take a rest tonight? You think you could go on with the deliberations tomorrow?

THE JUROR: I don't know. I don't know how—. I don't know.

THE COURT: Well, let me tell you this. You are entitled to vote your convictions, and you should vote your convictions, whatever they may be. That's why you're here. And you have no reason to be

ashamed of your convictions, whatever you may, and you have no reason to feel defensive about it. Okay?

THE JUROR: But I've been made to feel like I'm doing something wrong. I don't know what to do. I don't know whether I can do it.

THE COURT: Well, everyone has got to make up their own mind. Each juror has got to decide the case for themselves. And whatever your decision may be, you are entitled to it. You don't need to worry about that and you don't need to feel defensive about it.

THE JUROR: What if I can't vote now? What if I can't?

THE COURT: Well, you don't have to make up your mind right this minute. You're upset and you're tense and I think you need a rest. Now I've sent the other jurors on over to the hotel to get something to eat. I know you must be hungry.

THE JUROR: I'm not hungry.

THE COURT: Would you like to simply go back to your room and rest? Would you like to see a doctor?

THE JUROR: I don't know. I don't know. I don't know whether I'll be voting now my conviction or voting because I'm just voting to get it over with. I don't know. I'm mixed up. I don't know.

THE COURT: Well, I think you need some time to think. It's not a decision that has to be made right this minute. . . . I want you to go on back to the hotel with the bailiff. If you want to get some supper, that's fine. If you don't want to eat, you don't have to eat. But rest. And—

THE JUROR: I want to go home.

THE COURT: Well, you can't go home yet. I can't excuse you from service on the jury just yet. You feeling a little better?

THE JUROR: I just feel hot.

THE COURT: Well, you go back over to the hotel now with the bailiffs, and rest. Okay? And perhaps you'll be able to know your own mind better in the morning. Okay? That sound better?

THE JUROR: I guess if I have to try.

THE COURT: Okay.

DECIDED NOVEMBER 30, 1989 —
RECONSIDERATION DENIED DECEMBER 20, 1989.

*Jackson & Schiavone, G. Terry Jackson, Michael G. Schiavone,* for appellant.

*Charles M. Ferguson, District Attorney,* from Pataula Circuit, *Michael J. Bowers, Attorney General, William B. Hill, Jr., Deputy*

*Attorney General, Paula K. Smith, Assistant Attorney General,* for appellee.