A99A0666, A99A0667. BRIGHT v. THE STATE (two cases).
(520 SE2d 48)

ANDREWS, Judge.

Dudley Glen Bright appeals from denial of his motions for new trial after his convictions of seven counts of kidnapping,[1] three counts of aggravated assault, one count each of motor vehicle theft,

---

[4] A MARTA bus card was found on Anderson's person when he was arrested.

[1] Bright was also convicted of seven counts of false imprisonment regarding the same seven victims of the kidnapping. The false imprisonment charges were merged with the kidnapping convictions.

robbery, armed robbery, and misdemeanor escape (Case No. A99A0666) and three counts of aggravated sodomy, two counts of child molestation, and one count of aggravated child molestation (Case No. A99A0667). The two cases are consolidated for purposes of appeal.

### Case No. A99A0667

1. Bright's fifth enumeration, that the trial court erred in denying his motions for directed verdict at the close of the State's case and the close of all the evidence, challenges the legal sufficiency of the evidence and will be considered first.[2] OCGA § 17-9-1; *Martin v. State*, 219 Ga. App. 277, 278 (1) (464 SE2d 872) (1995); *Towns v. State*, 185 Ga. App. 545 (365 SE2d 137) (1988).

Viewed in the light most favorable to the jury's verdict, *Wilson v. State*, 233 Ga. App. 327, 328 (1) (503 SE2d 924) (1998), the evidence was that Bright was the first cousin of Philip Adams who had brought Bright to live with him, his wife and two children so that Bright could get his life in order. Bright and Adams also began an exotic snake breeding business, which they conducted in a building behind the residence, referred to as the snake house. In addition to the Adams children, Matthew, age two, and K. A., age seven, Mrs. Adams' niece, H. L., age ten, was staying with the Adams family during the summer of 1996.

The house had two bedrooms upstairs, occupied by Mr. and Mrs. Adams and their children and H. L. Bright slept on a hide-a-bed sofa in the living room downstairs.

On September 6, 1996, Mrs. Adams had allowed K. A. and H. L. to stay up late and watch television in the living room with Bright. Bright assured Mrs. Adams it was okay with him and he would be with them. Around midnight, when the girls had not come to bed, Mrs. Adams went to check on them and found K. A. asleep on the floor and H. L. sitting in Bright's lap, wearing only the large T-shirt in which she slept. Both H. L. and Bright acted surprised.

The next morning, Mrs. Adams asked H. L. what they had been doing, and she initially said nothing. Asked if Bright touched her anywhere, H. L. said that he had touched her on her private between her legs. H. L. also said that Bright had improperly touched K. A. in

---

[2] In Case No. A99A0667, Bright was convicted of the following: Count 1, aggravated sodomy on K. A. by placing his mouth on her vagina; Counts 2 and 3, aggravated sodomy by placing his penis in K. A.'s mouth on two occasions; Count 4, child molestation by fondling K. A.'s vagina; Count 5, child molestation by fondling H. L.'s vagina; and Count 6, aggravated child molestation by placing his mouth on K. A.'s vagina in the presence of H. L. All acts were alleged to have occurred between March 1, 1996 and September 7, 1996, except for Count 5, alleged between August 1 and September 7, 1996.

her presence, and K. A. confirmed this.

K. A. and H. L. were initially interviewed by Officer O'Brien on September 7 and indicated that Bright had only touched them with his hand on their privates. On September 16, Department of Family & Children Services supervisor Dooley interviewed K. A. again, with Officer O'Brien present and her parents watching from behind a one-way mirror. During that interview, K. A. said that Bright touched her and H. L. on their privates while they were under a tent formed by a blanket while they sat on the couch watching television. This sometimes happened when K. A.'s parents were also in the room, but could not see due to the blanket. Additionally, K. A. revealed that Bright had made her suck his private, both in the house on the sofa and in the snake house when only she, he, and H. L. were present. When she did this, "water" came out of his private. On at least one occasion, Bright also licked her private.

K. A. did not tell her parents any of this because Bright had told her not to and she was afraid of him.

H. L. testified that Bright repeatedly touched her private part with his hand while she, he, and K. A. were on the sofa. She also witnessed Bright put his mouth on K. A.'s private part and saw him place his penis in K. A.'s mouth. She also did not tell about these events because Bright told her not to.

Bright's argument that the element of force was not adequately shown with regard to the aggravated sodomy counts, based on *State v. Collins*, 270 Ga. 42 (508 SE2d 390) (1998), is without merit. That case dealt with forcible rape and:

> [a]lthough the State must prove the element of force to obtain a conviction for forcible rape of a victim under the age of consent, the Supreme Court has distinguished forcible rape from other sexual offenses and made clear that no such proof is required to obtain a conviction for aggravated sodomy against a victim under the age of consent. *State v. Collins*, [supra]; *Cooper v. State*, 256 Ga. 631 (352 SE2d 382) (1987).

*Brewer v. State*, 236 Ga. App. 546, 547 (2) (512 SE2d 30) (1999).

Therefore, there was no error and the evidence was legally sufficient. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Bright contends that his statement, given to Georgia Bureau of Investigation Agent White after he was taken into custody following the events at issue in Case No. A99A0666, was improperly admitted because he was "hearing impaired" and had not been provided with a qualified interpreter pursuant to OCGA § 24-9-103.

Although there was some evidence that Bright had a minor hearing deficit, there was no evidence that he was hearing impaired so as to qualify for an interpreter. OCGA § 24-9-101 (3) defines "hearing impaired person" as one whose "hearing is totally impaired or whose hearing is so seriously impaired as to prohibit the person from understanding oral communications when spoken in a normal conversational tone."

While Bright presented testimony of the superior court judge who had conducted one of his initial hearings, he testified only that Bright told him he was having trouble hearing the judge. Once the judge raised his voice from the bench, there was no further problem.

Officer O'Brien first interviewed Bright on September 7, and Bright never indicated any difficulty hearing during the interview which was conducted in a normal conversational tone. GBI Agent White interviewed Bright twice on September 10 and 11. Although he was aware that Bright said he had trouble hearing, he orally advised Bright of his rights in a normal conversational tone, and Bright indicated he understood them. No repeating was required. Bright possessed a driver's license with no restrictions and maintained several jobs with no apparent difficulties.

There was no error in admitting the statement.

3. Bright contends that the trial court's jury instruction on aggravated sodomy was error because it improperly alleviated the State's obligation to prove the element of force.

This argument has previously been considered and rejected by this Court. *Brewer*, supra.

4. Bright contends that the trial court's denial of his motion for mistrial during the testimony of Mrs. Adams was error.

The motion was made after the following exchange during Mrs. Adams' direct examination by the prosecutor:

Q. Have you had occasion to talk with [H. L.] on other occasions and as to her truthfulness or her ability to speak to you about things?
A. Oh, yes. She knows that she could talk to me about anything, I've always been close to her and her sister.
Q. Had you ever had any reason prior to this date to disbelieve or to question [H. L.] when she would tell you something?
A. No, because *she's always told me the truth.*

(Emphasis supplied.)

At this point, Bright's motion for mistrial was made, contending that this was an improper attempt to get the witness to give an opinion about the truthfulness of the complaining victim. Although the

trial court denied the motion, the jury was instructed to disregard the comment.

Bright is correct that a witness' credibility may not be bolstered by "the opinion of another, even an expert, as to whether the witness is telling the truth. . . . Credibility of a witness is . . . a matter solely within the province of the jury. OCGA § 24-9-80." *State v. Oliver*, 188 Ga. App. 47, 50 (2) (372 SE2d 256) (1988). See also *Smith v. State*, 259 Ga. 135, 138 (2) (377 SE2d 158) (1989).

Pretermitting the issue of whether Bright's motion was timely, since the initial question regarding truthfulness was not objected to, and assuming without deciding that the objected to question was an improper attempt to bolster the credibility of H. L., we find no reversible error. " '[E]ven if we were to construe the witness' testimony as improper bolstering, we hold that in the context of the evidence as a whole, it is highly probable that the testimony in question did not contribute to the verdict.' (Punctuation omitted.) [Cit.]" *Brooks v. State*, 232 Ga. App. 115, 120 (18) (501 SE2d 286) (1998).

Bright's own statement indicated that he did not contest that he had touched both victims on their vaginas, which was the only touching of H. L. with which he was charged. Compare *Lagana v. State*, 219 Ga. App. 220, 221 (1) (464 SE2d 625) (1995).

Therefore, there was no error in denial of the motion for mistrial.

5. Bright's remaining enumeration is that the trial court erred in refusing to excuse a juror.

During voir dire, the jury was asked if anybody knew K. A.'s parents, Philip or Trudy Adams. Juror Dyer did not respond affirmatively to that question, but the next morning he reported that during the previous evening, he had realized that he had not previously known her, but had had some incidental contact with Mrs. Adams when she came to pick up a prize at his radio station during the previous year or so. He assured the court and parties that he could set that aside and be fair and impartial.

Bright's counsel argued that, had he known this, he would have used a peremptory strike on the juror and asked that he be excused.

In order for a defendant to secure a new trial in the situation in which defense counsel lacked an item of information which objectively counsel should have obtained from a juror on voir dire, the defendant must show that the juror on voir dire failed to honestly answer a material question and that a correct response would have been a valid basis for challenge for cause. *Isaacs v. State*, 259 Ga. 717, 740 (44) (e) (386 SE2d 316) (1989). Accord *Stiles v. State*, 264 Ga. 446, 448 (3) (448 SE2d 172) (1994); *Gardiner v. State*, 264 Ga. 329, 333 (3) (444 SE2d 300) (1994); *Poole v. State*, 262 Ga. 668, 669 (2)

(424 SE2d 275) (1993). See also *Gainesville Radiology Group v. Hummel*, 263 Ga. 91 (428 SE2d 786) (1993).

*Royal v. State*, 266 Ga. 165, 166-167 (465 SE2d 662) (1996).

This Bright has failed to do. Merely knowing a witness does not disqualify a juror absent a finding that it creates a fixed and definite bias in the juror's mind, an element completely lacking here. *Wright v. State*, 233 Ga. App. 358, 361 (2) (504 SE2d 261) (1998).

### Case No. A99A0666

The events at issue in this case began the day of Bright's first appearance hearing on the child molestation charges involved in Case No. A99A0667.

6. In his sixth enumeration of error, Bright challenges the legal sufficiency of the evidence by claiming error in denial of his motion for directed verdict, *Martin*, supra, and this enumeration is considered first. His argument is directed at the kidnapping charges and that is all we consider. Bright was convicted of kidnapping H. L., Henderson and her two children, and Mrs. Adams and her two children. While Bright acknowledged at trial that he held Henderson and Mrs. Adams against their will, he disputed that he kidnapped the children.

Viewed in the light most favorable to the jury's verdict, the evidence was that Bright was brought to magistrate's court on September 9, 1996, by Deputy Price, who was unarmed. After the hearing, Price attempted to handcuff Bright for transport, whereupon Bright snatched his arms away, turned over a table, and knocked Price down. Chief Sheriff's Deputy King had come into court looking for another officer and was standing near the judge's bench when Bright lunged at him, hit him with his fist, and took his nine millimeter Berretta service automatic. Bright pointed the gun at Price who was near the door and told him to move or he would shoot. Bright then ran out the door, barefooted and wearing his orange jail jumpsuit.

Anderson, the judge's secretary, fled into the judge's office, from which she watched Bright pointing the gun at a woman about 30 feet away. Kleiwer and her three small children were walking near the courthouse when she saw a barefooted man in an orange jumpsuit running toward her with a gun. Bright approached her, pointed the gun at her and said he did not want to hurt her, but wanted her car. She gave him her car keys, and he left in her car.

Philip Adams had been called by Bright from the jail earlier that day and requested to put his house up for Bright's bail. When he refused, Bright told him he "would be a target." Adams was home that afternoon and saw Bright pull up wearing the jumpsuit around

3:30 p.m. and was aware that something was wrong. He went outside to meet Bright and noticed the gun. Adams told Bright to get his belongings and leave, whereupon Bright cocked the gun and discharged a bullet into the ground. Bright then pointed the gun at him, and they walked into the house, where Bright told him that he had said he was a target and "I'm going to do you right here."

Adams asked Bright to take him outside, because his wife and children as well as other children were in the house. As they stepped outside, Adams was walking behind Bright, and Adams saw an opportunity and fled. He heard Bright yell "stop" and heard a shot. The shot entered the side of the house behind him. Adams encountered officers who had been dispatched pursuant to Bright's escape, and the home was surrounded and put under surveillance by the officers.

Henderson, Mrs. Adams' sister-in-law, had arrived at the Adams house earlier to pick up her two-year-old son, Dillon, who stayed with Mrs. Adams. Henderson had her four-year-old, Ricky, Jr., with her. She was talking to Mrs. Adams when she saw Bright drive up and come toward the house. She heard Mrs. Adams tell Mr. Adams to get rid of him, and she went into the kitchen and called 911 on the portable phone.

Henderson was standing in the living room, still with the telephone, when the bullet hit the side of the house, shattering the window and showering her with glass.

Mrs. Adams, K. A., Matthew, H. L., Henderson and her two children all went upstairs into one of the bedrooms and shut the door. Henderson held the door shut while Mrs. Adams and the children hid in a closet. Henderson heard Bright come up the stairs and felt him pull on the bedroom door. She managed to pull it shut again, but Bright told her she had better open it and she did. At that point, Bright took the phone, grabbed her and put the gun to her head while holding her by her blouse.[3] He directed Mrs. Adams and the children to come out of the closet and go downstairs. He continued holding Henderson with the gun to her head, and they started downstairs after the others. As H. L., K. A., and Ricky, Jr. approached the front door, one of them opened it and they all three ran as Henderson and Mrs. Adams encouraged them.

Bright then forced the two women, each holding her infant child, to walk one in front of him and one behind, shielding him as they went to the snake house, which he felt was less susceptible to sniper attack. Later, they returned to the house in the same fashion. After

---

[3] Bright had earlier gone into the snake house and gotten some of his clothes, which he had put on over his jumpsuit.

eight hours of hostage negotiations, Bright released the remaining two women and children and was taken into custody.

Bright's argument that the evidence was insufficient on the three counts of kidnapping H. L., K. A., and Ricky, Jr. is tenuous at best. The evidence was legally sufficient. *Jackson v. Virginia*, supra; *Cosby v. State*, 234 Ga. App. 723, 724 (2) (507 SE2d 551) (1998).

7. Bright's first enumeration contends the court erred in not allowing him to go behind the child molestation warrant pursuant to which he was arrested and challenge the existence of probable cause. If there were no probable cause, Bright contends he was improperly convicted of misdemeanor escape.

Such an argument, however, is made moot by our conclusion in Case No. A99A0667 that there was legally sufficient evidence of those charges.

8. The second enumeration is that the trial court erred in denying Bright's motion for mistrial based on the prosecutor's opening statement in which he alluded to the child molestation charges.

Not only was no objection made by Bright at the time of this allusion, leaving this claimed error not properly preserved for our review, *Wilson v. State*, 259 Ga. 55, 57 (4) (376 SE2d 676) (1989), but Bright also repeatedly referred to the child molestation charges. We do not recognize induced error. "Asserted prejudice based upon induced error is impermissible. [Cits.] *Sharp v. State*, 183 Ga. App. 641, 643 (3) (360 SE2d 50) (1987)." (Punctuation omitted.) *Martin v. State*, 235 Ga. App. 844, 845 (2) (510 SE2d 602) (1998).

9. In his third enumeration, Bright objects to a portion of the trial court's instruction to the jury on aggravated assault, contending that it alleviated the State's obligation to prove that Bright had the intention to commit injury. The objected-to portion of the charge follows:

> You must determine from the evidence in this case whether or not a firearm was pointed at anyone. If the pointing of a firearm places the victim in reasonable apprehension of receiving an immediate violent injury, *the crime of aggravated assault has occurred.*

(Emphasis supplied by Bright.)

Such an argument, however, ignores the portion of the charge immediately preceding the objected-to paragraph, which states that:

> To constitute an assault, actual injury to the other person need not be shown[;] it is only necessary that the evidence show beyond a reasonable doubt *an intention to commit injury on another person* coupled with the apparent ability

to commit that injury. . . .

(Emphasis supplied.)

Even assuming that the objected-to paragraph could be said to be confusing when taken out of context, that is not the standard.

> "Where a charge as a whole substantially presents issues in such a way as is not likely to confuse the jury even though a portion of the charge may not be as clear and precise as could be desired, a reviewing court will not disturb a verdict amply authorized by the evidence. There is no error where it is unlikely that the instructions considered as a whole would mislead a jury of ordinary intelligence." (Citations and punctuation omitted.) *Pullins v. State*, 232 Ga. App. 267 (1) (a) (501 SE2d 612) (1998).

*Pickstock v. State*, 235 Ga. App. 451, 452 (1) (509 SE2d 717) (1998).

There was no error.

10. Bright's fourth enumeration urges error in the trial court's refusal to give three of his requested charges to the jury, all of which dealt with the defense of justification.

Bright argues that such a defense was supported by evidence that he was afraid of being killed by the officers after he took the women and children hostage and that he had been wrongfully accused of the child molestation charges and wanted the truth of his innocence known.

Because of our conclusions in Case No. A99A0667, supra, we need not further address these latter two claims.

Regarding his fear of being killed, although his argument is unclear, Bright apparently urges that his fear of the police could justify his kidnapping the seven innocent women and children. Since Bright was not charged with any offenses against the police who surrounded the house during the standoff, the justification must be in connection with the kidnapping. None of the cases cited by Bright indicates that such a scenario merits the giving of the justification charge, and we find none. Compare *Nelson v. State*, 213 Ga. App. 641, 642 (2) (445 SE2d 543) (1994).

Additionally, the appropriateness of the defense of justification is determined by a reasonable man standard.

> The fears of the slayer that will justify a homicide must be the fears of a reasonable man, and if the defendant is an unusually timid man, or lacking in courage, and committed the homicide under circumstances that would not generate fears in a hypothetical reasonable man, he would not be justified.

*Bivins v. State*, 200 Ga. 729, 733 (1) (38 SE2d 273) (1946).

The same rationale applies to claimed justification for kidnapping in the present situation, and we conclude that Bright's fears were not reasonable.

There was no error in not giving the requested charges. Compare *Jones v. State*, 220 Ga. App. 784 (470 SE2d 326) (1996).

11. Finally, Bright claims error in the trial court's refusal to give his requested charge on reckless conduct, which he contends is a lesser included offense of his aggravated assault against Philip Adams.

OCGA § 16-5-60 (b) defines reckless conduct, in pertinent part, as that conduct by which a person consciously disregards "a substantial and unjustifiable risk that his act . . . will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. . . ."

As acknowledged by Bright, the crime is a species of criminal negligence. In order for such a charge to be appropriate, however, it must be reasonably raised by the evidence at trial. *Martin v. State*, 268 Ga. 682, 685 (6) (492 SE2d 225) (1997). Here, the evidence was that, either Bright had threatened to kill Mr. Adams and intentionally discharged his gun at him when he ran, or Bright, as he testified, "deliberately shot into the window" above Adams' head, intending to scare him, neither of which was negligent. Bright was either guilty of aggravated assault or not under the evidence. *Morris v. State*, 228 Ga. App. 90 (491 SE2d 190) (1997).

*Judgments affirmed. McMurray, P. J., and Ruffin, J., concur.*

DECIDED JUNE 25, 1999 —
RECONSIDERATION DENIED JULY 8, 1999 — CERT. APPLIED FOR.

*Virgil L. Brown & Associates, Bentley C. Adams III*, for appellant.

*N. Stanley Gunter, District Attorney, Lynn Akeley-Alderman, Assistant District Attorney*, for appellee.